William E. Peterson, Bar No. 1528
Janine C. Prupas, Bar No. 9156
**SNELL & WILMER L.L.P.**
50 West Liberty Street, Suite 510
Reno, Nevada 89501
Telephone  775-785-5440
Facsimile:  775-785-5441
Email:  wpeterson@swlaw.com
  jprupas@swlaw.com

Richard K. Welsh (admitted *pro hac vice*)
Jeffrey A. Zuidema (admitted *pro hac vice*)
Kate M. Hammond (admitted *pro hac vice*)
**MCDERMOTT WILL & EMERY LLP**
2049 Century Park East, Suite 3800
Los Angeles, California 90067
Telephone:  310-277-4110
Facsimile:   310-277-4730
Email:  rwelsh@mwe.com
        jzuidema@mwe.com
        khammond@mwe.com

Counsel for Defendant
SIERRA NEVADA BREWING CO.

# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| CROWN BEVERAGES, INC., a Nevada corporation,<br><br>                    Plaintiff,<br><br>          v.<br><br>SIERRA NEVADA BREWING CO., a California corporation; DOES I through X, inclusive,<br><br>                    Defendant. | Case No.  3:16-cv-00695-MMD-VPC<br><br><br>**SIERRA NEVADA BREWING CO.'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
LOS ANGELES

1

## I.    **INTRODUCTION**

2    Sierra Nevada Brewing Co. respectfully requests that the Court deny Crown Beverage

3  Inc.'s motion for a preliminary injunction, because Crown failed to establish the likelihood of

4  success on the merits of its claims and the possibility of suffering irreparable harm.  Sierra

5  Nevada terminated Crown's Distributor Agreement in large part based on its long history of poor

6  performance of market standards and its leadership's open, often drunken and profane hostility

7  toward Sierra Nevada employees and others.  Sierra Nevada documented its concerns with

8  Crown's serious misconduct and met with its management to discuss them.  While Crown would

9  briefly improve its performance and vow to change its behavior, Crown would invariably soon

10 revert to its problematic ways.  These recurring problems are unique to Crown and create an

11 intolerable working relationship, which Crown's own industry expert voluntarily described as

12 "poisoned" and "deteriorated."  A brewer and its distributor must have a positive working

13 relationship to execute an effective market strategy, working hand-in-hand to nurture retail

14 relationships and build community rapport in a very competitive market.  In one shocking display

15 of bad judgment or aggression after another, Crown has destroyed its relationship with Sierra

16 Nevada since Jaye and Paul Bond incrementally acquired majority ownership in last three years.

17 By November 2016, Sierra Nevada had ample "good cause" to end its relationship with Crown,

18 and Crown failed to justify the "extraordinary and drastic" remedy of an injunction.

19    First and foremost, Sierra Nevada cannot in good conscious send its employees to Crown

20 because it has an unsafe, intolerable work environment.  Almost three years ago, Sierra Nevada

21 asked Crown's president, Paul Bond, to quit intimidating Sierra Nevada's employees and to

22 ensure Crown has no firearms present at meetings.  Sierra Nevada employees observed Mr. Bond

23 intoxicated and firearms on Crown's premises.  In that dangerous environment, he would berate

24 them and others with vulgar, hostile language, often in response to Sierra Nevada's concerns

25 about negative feedback from the market on Crown's poor performance.  His own loyal people

26 reluctantly admitted that they have seen him drink during business hours and heard him holler

27 obscenities at people like "I am going to make your ass bleed" and tell racist jokes.  They have

28 also seen him yell and swear at Sierra Nevada employees, such as Tim Day and Bryan Rosario,

McDermott Will & Emery LLP
Attorneys At Law
Los Angeles

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
LOS ANGELES

1   who work tirelessly in Crown's market to improve Sierra Nevada sales.  Other beer suppliers and

2   retailers have had similar problems at Crown, characterizing Mr. Bond as "toxic" and "volatile."

3       Furthermore, Crown fails to quote any of its contractual duties to Sierra Nevada in its 30-

4   page motion, because Crown has breached almost all of them.  For starters, Crown failed to

5   provide a competitive level of beer distribution service, as its contract requires.  The largest

6   retailers in the market all agree that Crown has long been the worst distributor in town.  Some

7   have called it "Clown Beverages."  Far from having "meticulous precautions" in place consistent

8   with industry standards, retailers have uniformly complained about Crown's display execution,

9   sales efforts, and delivery service, including serious issues with out-of-code (OOC) and out-of-

10  stock (OOS) beer.  When these retailers would question Crown's performance levels, Crown was

11  often times nonresponsive or, even worse, Mr. Bond responded with profanity and aggression.

12  For example, when Safeway's then-liquor manager, Becky Denoyer, brought to Crown's

13  attention that its merchandiser forged her signature on an activity log purporting to reflect work

14  done by Crown at Safeway, Mr. Bond called her, in slurred but unmistakable words, a "lying

15  fucking bitch."  She also heard from a former Crown employee that Mr. Bond referred to her as

16  "the fucking cunt."  Mr. Bond almost came to blows with, threatened, and berated others in the

17  market, including retailers, often while drunk.

18      Mr. Bond runs Crown and admitted it is "the face of the Sierra Nevada brand" in the

19  Northern Nevada market.  Crown's industry expert said the distributor's relationships with its

20  retailers are "everything," because "they decide whether you live or die."  To that end, Sierra

21  Nevada's contract prohibits Crown from harming Sierra Nevada's image, which Mr. Bond

22  admitted is a reasonable term because he, too, conceded that retail relationships are critical.  To

23  protect its large market share, Sierra Nevada has sent employees into the prime Northern Nevada

24  market to build positive relationships and resolve problems caused by Crown.  Yet Crown credits

25  itself with strong sales growth, which the leading retailers like Raley's and Safeway attributed not

26  to Crown's often shoddy work but to Sierra Nevada's strong brand and marketing efforts.

27      Indeed, contrary to Crown's contention that Sierra Nevada had no issues with Crown

28  other than a "petty personality qualm" with Mr. Bond "akin to a playground dispute," Mr. Bond

admitted that Sierra Nevada raised many issues with Crown's performance during the November 15 meeting with Crown.  His memory comports with Sierra Nevada's termination letters, which document multiple grounds for good cause.  Thus, Crown's *only* proposed cure – to try to end direct contact between Sierra Nevada and Mr. Bond – was no cure at all, because it failed to address Crown's performance or safety issues and, as a practical matter, he owns and runs Crown as the face of Sierra Nevada in the market.  There is no work-around Mr. Bond.

In an ordinary circumstance, a company like Crown would have simply fired a "toxic" and "volatile" president like Mr. Bond during its 60-day cure period that expired on January 8, 2017, arguably solving the safety and reputational problems.  Indeed, Crown's expert, the former President of the Nevada Beer Wholesalers Association, owns a distributorship and admitted that he would fire a manager who cursed at a retailer or supplier because that conduct is unprofessional and intolerable.  But despite a contractual and statutory duty to obtain Sierra Nevada's approval of any change in Crown's ownership, Crown failed to disclose to Sierra Nevada that Crown's prior owners, Ginochio family members, sold their majority interest to the Bonds over the last three years, which evidently emboldened Mr. Bond.  Sierra Nevada also learned during discovery that from at least 2007 until sometime in 2013, Crown lacked the licenses required to lawfully sell beer – "*slipped through the cracks*" – again contrary to its contractual and statutory requirements.  Here, too, Crown failed to disclose this breach to Sierra Nevada.  Neither breach requires Sierra Nevada to provide Crown a cure period before terminating it under Nevada law.  Nor does Nevada law require Sierra Nevada to accept a cure when Crown's offenses are incurable by their nature, because they implicate fundamental issues of reputation, safety, and trust.  There is, at bottom, no basis to provide Crown any relief.

## II.   THE PRELIMINARY INJUNCTION STANDARD

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion."  *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).

McDermott Will & Emery LLP
Attorneys At Law
Los Angeles

### III.    NEVADA'S "GOOD CAUSE" AND CURE LAW

Nevada law permits a supplier to terminate a distributor if the supplier has "good cause" or the distributor commits certain actions, including the failure to obtain approval of ownership transfers or to maintain liquor licenses.  NRS 597.155, 597.160.  Certain grounds for termination provide the distributor a cure period and others do not.  And some breaches are incurable.

### A.    A Supplier May Terminate a Distributor for Good Cause

"Good cause" includes a "[f]ailure by a wholesaler to comply substantially with essential and reasonable requirements imposed on him or her by a supplier, or sought to be imposed by a supplier."  NRS 597.133.  While the statute recognizes that franchise "agreements" may be "written or oral" (597.130), the definition of "good cause" does not include the term "agreement."  Rather, "good cause" includes a failure to comply with "requirements" that are "sought to be imposed" by the supplier.  Thus, a supplier may have "good cause" to terminate a distributor based on "requirements" not expressly included in an agreement.  NRS 597.130, 133.  In addition, "good cause" includes "[b]ad faith by the wholesaler in carrying out the terms of the franchise agreement."  NRS 597.133.

In the year before Sierra Nevada and Crown executed their 1986 Distributor Agreement, this District Court rejected an alcohol distributor's motion for a preliminary injunction and claims in a consolidated trial in favor of an alcohol supplier based on the supplier's "good cause" for termination.  *American Mart Corp. v. Joseph E. Seagram & Sons, Inc*., 643 F. Supp. 44, 48 (D. Nev. 1985).  The Court noted that the supplier, Seagram, could lawfully terminate the distributor if "good cause" existed under Nevada's franchise laws.  *Id*. at 48-49.  The statute stated that "no supplier shall unilaterally terminate … any franchise with a wholesale dealer … unless the supplier has first established good cause for such termination."  *Id*. at 48.  The Court also noted that under the statute, "it is a complete defense for the supplier to prove that such termination … was done in good faith and for good cause."  The Court observed that Nevada law does "not define good cause."  *Id.*  The Court further noted that some states require the supplier to prove "distributor misconduct or failure of performance."  *Id*.  The distributor urged that the Court to adopt that definition.  *Id*.  After reviewing the Nevada statute and case law, however, the Court

McDermott Will & Emery LLP
Attorneys At Law
Los Angeles

concluded that "good cause to terminate a franchise exists even where there is no distributor fault, when in the ***exercise of prudent business judgment*** the supplier terminates the franchise for grounds that ***are truly legitimate and are not arbitrary, capricious, irrational, unreasonable or irrelevant***." *Id.* [1]  Seagram, the supplier, terminated the distributor because it wanted to reduce the number of distributors with which it worked to save money.  Acknowledging the "Court has no such expertise" in the alcohol industry, the Court declined the distributor's invitation to second guess Seagram's good faith business judgment in deciding to terminate. *Id.* at 49.

The Legislature adopted this approach when it defined "good cause" by amendment to the statute in 1995.  Legislative History ("LH") at p. 127.  Wholesaler Distributors Association Lobbyist, Harvey Whittemore, told the Legislature that the now-current version of the statute would simply "codify and perhaps amplify" the holding of *American Mart*.  LH at 16.  Indeed, in 1995, the Legislature rejected a proposed definition that "'Good cause' must be determined solely from the behavior of the wholesaler and does not relate to activities of the supplier even if those activities are based on bona fide economic or business reasons."  LH at 127.  Instead, "good cause" includes a "failure by a wholesaler to comply substantially with ***essential and reasonable requirements*** imposed on him or her by a supplier, or sought to be imposed by a supplier."  And it still remains a "complete defense" to Crown's statutory claim if Sierra Nevada terminated in good faith and for good cause.  NRS 597.180.

### B.    The Supplier Need Not Send a Written Notice to the Distributor Detailing Every Fact to Initiate the Termination

Crown argues Nevada law requires Sierra Nevada to exhaustively list every fact supporting termination in its termination notice and that Sierra Nevada cannot cite any facts it uncovered after it sent Crown that notice.  Crown is wrong on both accounts.

The supplier must send a notice to the distributor simply identifying "[t]he reason for the proposed action and a description of any failure of the wholesaler to comply with the terms, provisions and conditions of the franchise alleged by the supplier," potentially including "[a] statement that the wholesaler may correct any such failure within the period prescribed in NRS

---

[1] All emphasis is added unless noted otherwise.

McDermott Will & Emery LLP
Attorneys At Law
Los Angeles

1    597.160."  NRS 597.155.  This statute, however, does not require the supplier to list every fact in

2    writing supporting its grounds for termination, let alone impliedly or expressly preclude the

3    supplier from relying on grounds that it discovers after sending the notice.  *See C.C.S. Chicago*

4    *Recreation, Inc. v. American Suzuki Motor Corp.*, 1996 WL 99906, at *5 (N.D. Ill. Mar. 1, 1996)

5    ("In determining whether good cause existed, the court is not limited to the reasons initially

6    identified by the franchisor as cause for termination but may also consider 'after acquired'

7    evidence of a franchisee's misconduct or breach."); *Tuf Racing Prods., Inc. v. American Suzuki*

8    *Motor Corp.*, 1998 WL 299300, at *5 (N.D. Ill. June 3, 1998) ("there is nothing improper about

9    allowing the franchisor to submit evidence of additional reasons for termination should they come

10   to light *after* the initial notice.").

11          Even in employment termination lawsuits courts find after-acquired evidence of wrongful

12   conduct to be relevant and admissible:  "The after-acquired evidence doctrine precludes or limits

13   an employee from receiving remedies for wrongful discharge if the employer later discovers

14   evidence of wrongdoing that would have led to the employee's termination had the employer

15   known of the misconduct."  *Rivera v. NIBCO, Inc.*, 364 F.3d 1057, 1070-71 (9th Cir. 2004). *Id.*;

16   *see also Van Asdale v. Int'l Game Tech.*, No. 3:04-CV-703-RAM, 2009 WL 4828708, at *9 (D.

17   Nev. Dec. 8, 2009), *aff'd sub nom.* 549 F. App'x 611 (9th Cir. 2013).  Indeed, the Supreme Court

18   held that "[o]nce an employer learns about employee wrongdoing that would lead to a legitimate

19   discharge *we cannot require the employer to ignore the information, even if it is acquired*

20   *during the course of discovery* in a suit against the employer and even if the information might

21   have gone undiscovered absent the suit."  *McKennon v. Nashville Banner Publ. Co.*, 513 U.S.

22   352, 362 (1995).

23          **C.      The Distributor Has a Right to Cure Only Certain Grounds for Termination**

24          The distributor generally has 60 days to "to correct any failure to comply with the terms,

25   provisions and conditions of the franchise alleged by the supplier."  NRS 597.160(3).  But

26   consistent with the common law rule that a party need not entertain a "cure" where the problem is

27   too serious to be curable, the statute also grants the supplier the right to terminate the distributor

28   immediately when, for example, the distributor "[h]as had his or her *license to sell alcoholic*

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
LOS ANGELES

*beverages* issued pursuant to state or federal law revoked or suspended for more than 31 days";

"[h]as committed fraud or has made a ***material misrepresentation*** in his or her dealings with the

supplier or the products of the supplier"; or "any other person who has a financial interest in the

wholesaler has: ***Changed or attempted to change the beneficial ownership or control*** of any

such entity, unless the wholesaler ***first notified the supplier in writing*** and the supplier has not

unreasonably withheld his or her ***approval***." NRS 597.155(2)(a)(f) and (j).

In addition, courts have the power to find that some wrongs are simply incurable. *See*,

*L.K. Comstock & Co., Inc. v. United Eng'rs & Constructors, Inc.*, 880 F.2d 219, 232 (9th Cir.

1999) (no requirement to entertain a cure because "[t]he law does not require a ***useless act***,

particularly where…it would ***only enhance the actor's loss***"); *Giuffre Hyundai, Ltd. v. Hyundai*

*Motor Am.*, 756 F.3d 204, 208 (2d Cir. 2014) (no requirement to entertain a cure where

fraudulent, ***illegal*** and deceptive trade practices are established as a matter of law, no right to cure

is necessary prior to termination of the contract); *Allied Health Ass'n, Inc. v. Arthrocare Corp.*,

2009 WL 1424509 at *9 (N.D. Cal. May 20, 2009) (*citing Rand Intern, Inc. v. LucasFilm Ltd.*,

2008 WL 2987079, at *3 (N.D. Cal. Aug. 27, 2008) (a breach of contract which "threatens to do

significant harm to the Licensor or its ***commercial reputation***, may, in fact, render such breach

incurable")); *see* 2 Corbin on Contracts § 1266, p. 442 (C. Kaufman supp. 1984) (recognizing

certain breaches are incurable even if there are notice and cure provisions).  In short, Nevada law

does not grant Crown a perpetual right to cure any problem, regardless of frequency or severity.[2]

## IV.   FACTUAL BACKGROUND

### A.   Sierra Nevada's Business

Formed in 1980, Sierra Nevada is a Chico, California-based brewery specializing in the

production of craft beer, which is a growing and highly competitive market segment.  Sierra

Nevada's success is linked to the freshness and quality of its beer.  To protect its brand, Sierra

Nevada requires its distributors to perform to brand standards and quality standards.  In regard to

---

[2] This Court may rely on out-of-state authority in determining Nevada law.  *Nev. Judges Ass'n v. Lau*, 112 Nev. 51, 58 (1996); *Hudson v. Horseshoe Club Operating Co.*, 112 Nev. 446, 456 (1996) ("We consider the approach taken in Arizona and other jurisdictions persuasive").

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
LOS ANGELES

brand standards, Sierra Nevada wants its distributors to achieve a market position in terms of the location of its beer brand on store shelves (at eye level, e.g.) and the number of beer styles (porter, ale, wheat, e.g.), displays (end-caps in stores, e.g.), draft handles at bars, and marketing materials (neon lights, stickers, e.g.), each of which must be on par with Sierra Nevada's closest craft competitor in the market. Ex. L at 149:3-153:17. In terms of quality, Sierra Nevada requires its distributors to properly rotate and move its beer to avoid having OOC (i.e., old) beer in the market, which may taste bad, and clean draft lines every two weeks. Ex. B at 143:7-19, 150:9-13; Ex. V at 6. The industry experts both agree that Sierra Nevada's standards are market and drive sales. Ex. B at 143:7-19; Ex. V at 6.

Sierra Nevada is subject to the three-tier regulatory system that governs the distribution of alcohol throughout most of the US. Ex. V at 4. Sierra Nevada contracts with licensed distributors to sell its products to retailers in specified regions. *Id*. at 3. Distributors are thus the face of Sierra Nevada in their markets, ensuring its products reach consumers through retailers. *Id*. These retailers include grocery stores, convenience stores, restaurants, and entertainment venues. *Id*. Sierra Nevada places great value in its relationships with its distributors. *Id*.

### B.   Sierra Nevada and Crown's Relationship

In 1986, Sierra Nevada and Crown entered into the Sierra Nevada Distributor Agreement (the "Agreement"). Ex. 2.[3] As the exclusive distributor in a large territory, Crown must, among other things, put forth its "best efforts" to promote the sale of Sierra Nevada's products "in an aggressive and diligent manner," cooperate with Sierra Nevada in "effectuating [its] promotions and merchandising programs," and "maintain prompt delivery service compatible with good business practice and the requirements of its customers," to be "no less prompt and effective than that of [Crown's] competitors." *Id*. at ¶ 2. Crown's competitors included, for example, New West, Morrey, Southern Wine & Spirits, and Breakthru. Ex. E at 231:23-232:3. To protect Sierra Nevada's brand, Sierra Nevada has the right to terminate Crown for certain breaches, including any conduct by Crown that damages Sierra Nevada's image. *Id*. at ¶¶ (3)(a)(iii), (3)(b)(iii).

---

[3] Numerical exhibits refer to Crown's exhibits to its Motion to Preliminary Injunction (ECF No. 14). Sierra Nevada's exhibits contain alphabetical designations.

McDermott Will & Emery LLP
Attorneys At Law
Los Angeles

C. **Crown's Long History of Problems**

Sierra Nevada has long identified Crown as a problematic distributor and tried to resolve the problems posed by Crown's limitations and personalities. In the mid-2000s, for example, Sierra Nevada's former area representative, Nick Lundquist, would work around issues caused by Mr. Bond's problematic personality by going to Crown's then-owner, Lawrence Ginochio, to resolve problems. Ex. X at ¶ 2. As detailed below, Mr. Ginochio passed away in 2007 and placed the company's stock in trust, the majority of which the Bonds bought from his family members in 2014-2015 without the required approval from Sierra Nevada.

As shown in Section V.A., Sierra Nevada documented its problems with Crown and met with its management team to resolve them over the last several years. Because Crown had proven by October 2016 of being incapable of working professionally with Sierra Nevada and meeting its reasonable performance standards, Matt Foster, Sierra Nevada's director of sales, met with Mr. Bond to tell him that Sierra Nevada wanted Crown to sell its brand rights to another distributor. Ex. D at 273:14-274:23. Sierra Nevada sent a follow-up letter underscoring this point, which Crown incorrectly read as a "termination letter" to justify its rush to file this lawsuit. Ex. 4. Sierra Nevada offered Crown the opportunity to sell so it could profit from the brand rights. If Sierra Nevada simply terminated Crown for good cause, Crown would have had no marketable brand rights to sell. In response, Mr. Bond refused to sell and Crown sued Sierra Nevada, publicly alleging that it terminated Crown "without any justification whatsoever." ECF No. 1.

D. **Sierra Nevada Terminates Crown's Agreement**

On November 9, 2016, Sierra Nevada sent Crown notice of termination establishing six grounds for good cause to terminate the Agreement. Ex. 5. Sierra Nevada noted that Crown's past and on-going conduct included: "(1) submitting false and misleading accounting reports, including overbilling Sierra Nevada on depletion accounts; (2) failure to provide a competitive level of service drawing complaints from retailers; (3) failing to meet Sierra Nevada's brand standards; (4) failing to meet standards of performance on key brand building executables; (5) improper care and oversight of Sierra Nevada products, including improper refrigeration and failure to maintain within expiration parameters; and (6) abusive and unprofessional conduct,

McDermott Will & Emery LLP
Attorneys At Law
Los Angeles

1    including keeping guns at Crown's facility." *Id.*  Sierra Nevada also indicated that it would

2    "consider any cure that Crown proposes within the next 60 days," i.e., January 8, 2017. *Id.*

3        The parties met on November 15, 2016 to attempt to resolve these issues.  Sierra Nevada

4    detailed the deficiencies identified in its termination letter.  Ex. D at 275:2-277:25.  Crown falsely

5    asserts that "Sierra Nevada conceded that most of the issues raised in the November 9 Letter had,

6    indeed, been resolved and were not current."  ECF No. 14 at 7.  Mr. Bond, however, testified that

7    numerous issues were raised at that meeting, including discussing brand standards, quality

8    standards, OOC product, bill-back issues, in addition to his being an alcoholic, abusive, and

9    aggressive.  Ex. D at 275:8-277:25.  And contrary to Crown's argument that Sierra Nevada

10   sprung "new standards" on Crown, Sierra Nevada made clear that it simply implemented

11   ***regionally*** a new process in October 2016 by which to measure the existing standards, which

12   Crown always clearly understood.  *Id.* at 276:19-22.

13       The next day, Crown wrote a letter proposing a single cure:  that "Mr. Bond will no longer

14   initiate communications (either verbal or written) with any of Sierra Nevada's employees or

15   agents," with all direct communications going to Andy Dempsey (a new Crown sales manager) or

16   Jaye Bond (who works in the front office).  Ex. 6.  Crown also proposed that if Sierra Nevada

17   wanted to meet with Crown, Sierra Nevada must provide notice and Mr. Bond would not attend.

18   *Id.*  That lone cure (inadequately) addressed only Sierra Nevada's problems with Mr. Bond's

19   unprofessional and threatening behavior.  *Id.*

20       On November 28, 2016, Sierra Nevada responded to Crown's "cure proposal" explaining

21   that it addressed ***only one*** of the six issues and that the single proposed cure failed to adequately

22   remedy the problems caused by Mr. Bond's behavior.  Ex. 8.  Sierra Nevada noted that "Mr.

23   Bond's drunken, aggressive behavior has persisted despite his promises to end it in response to

24   Joe Whitney's September 8, 2014 letter, in which Sierra Nevada specifically asked Mr. Bond to

25   end his unprofessional conduct and bullying."  *Id.*  Further, Sierra Nevada noted that "Mr. Bond

26   also directed his aggressive and abusive behavior towards some of the market's key retailers,

27   which reflects poorly on Sierra Nevada's brand image."  *Id.*  Crown responded on December 15,

28

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
LOS ANGELES

1   2016, repeating the same cure for Mr. Bond's conduct and denying (incredibly) that any of the

2   other issues identified in Sierra Nevada's termination letter exist.  Ex. A.

3          For the reasons identified below, Sierra Nevada rejected Crown's sole proposed cure and

4   advances multiple good faith grounds to end its dysfunctional relationship with Crown.

5   **V.     SIERRA NEVADA HAD AMPLE "GOOD CAUSE" TO TERMINATE CROWN
          ON MANY GROUNDS AND CROWN OFFERED ONLY ONE INADEQUATE**
6   **        "CURE"**

7          **A.     Crown Abused and Threatened Sierra Nevada Employees**

8          Crown consistently failed to comply with Sierra Nevada's requirement that Crown

9   provide a safe environment and act professionally.  Ex. Z at ¶ 44; Exs. MMM-QQQ.  Sierra

10  Nevada received numerous reports from its Northern Nevada team that Mr. Bond had been drunk

11  during work hours, physically threatened them, and swore at them.  In September 2013, Mr. Day

12  reported that he "[had] been disrespected on many occasions for many reasons by Paul and his

13  wife Jaye," including being "poked at, yelled at, screamed at, threatened and verbally abused."

14  Ex. WWW.  As Mr. Day explained, he has "never had any issues like this with anyone else in the

15  25+ years that [he has] been in the business."  *Id*.  In August 2014, Mr. Day again reported that

16  Mr. Bond "would go out of his way in order to make [Mr. Day] feel inferior," and become

17  "verbally confrontational," causing Mr. Day to feel "intimidated to go into Crown for anything"

18  due to Mr. Bond's "bullying."  *Id*.  Mr. Day noted that "Paul would only yell or bully me when I

19  was alone without my superiors," but "[w]hen they were around, he would become the nicest

20  person." *Id*.  Mr. Day also reported that he would receive late evening phone calls from Mr.

21  Bond, during which, "[i]n some cases, he could barely put words and sentences together."  *Id*.

22         After Sierra Nevada promoted Mr. Day to regional manager, it hired Bryan Rosario in

23  March 2013 to market its products in Northern Nevada and, by August 2014, he submitted his

24  own complaints to HR about Mr. Bond's "verbal abuse and threats."  Ex. XXX.  Mr. Rosario

25  worked for Crown for about four years, when Sierra Nevada secured Mr. Bond's approval to hire

26

27

28

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
LOS ANGELES

1    him.  *Id.*; Ex. D at 246:10-16.  Mr. Rosario and Mr. Day both felt "very uncomfortable" because

2    they knew that Mr. Bond had a gun in his office.  Ex. XXX.[4]

3         These reports prompted Joe Whitney and Matt Foster to meet with the Bonds on

4    September 5, 2014.  In addition to calling out Crown's performance, Mr. Whitney asked Mr.

5    Bond about the bullying and berating of Sierra Nevada employees and about the presence of

6    firearms.  Ex. L at 46:13-48:12.  Mr. Whitney recalled approaching this meeting with an open

7    mind and left even more confident that Sierra Nevada's complaints about Mr. Bond's conduct and

8    Crown's performance were accurate, in part because the Bonds did not deny the very serious

9    charges and committed to change moving forward.  *Id.*  Moreover, Sierra Nevada's former area

10   manager, Nick Lundquist, had previously informed him of Mr. Bond's drunken and

11   confrontational behavior.  Ex. L at 113:9-20; Ex. X at ¶ 2.

12        Mr. Whitney recounted the substance of the September 5 meeting in his September 8 letter

13   to the Bonds.  He "recited numerous instances of [Mr. Bond] losing [his] temper during meetings,

14   many of which after [he's] allegedly been drinking during business hours."  Ex. 15.  He recounted

15   "harassment, threats and bullying tactics" and his "***team no longer feels safe in your building***

16   ***and that is disturbing***," noting the presence of firearms.  *Id.*  To attempt to remedy the problem,

17   Scott Robinson of Sierra Nevada and Mr. Day met with Mr. Bond a week later.  As reflected in

18   Mr. Robinson's summary letter, Mr. Bond admitted that "the unprofessional behavior [Sierra

19   Nevada's] people have experienced from [him] at times ... included intimidation and verbal

20   abuse."  Ex. UUU.  Mr. Bond never disputed the accuracy of Sierra Nevada's letter or email –

21   until his deposition this year.  Ex. D at 235:10-19, 238:6-12, 254:2-10.

---

22   [4] Crown has attempted to vilify Mr. Rosario, asserting, for example, without evidence that he
     manipulated Crown's performance scores or conspired with management at Raley's to undermine
23   Crown because he is a "disgruntled" former employee.  What is worse, shortly after gratuitously
     questioning Mr. Rosario about Facebook pictures of his wife and young children, Crown's
24   counsel asked him if he was involved in a "sexual relationship" with Mike Connelly.  Ex. J at
     51:6-11.  Mr. Connelly owns Sierra Tap House, which is the largest Sierra Nevada draft beer
25   account in Nevada.  Ex. D at 56:3-16; Ex. M at 41:8-11; Ex. N at 93:2-10.  He has been critical of
     Crown's performance for over 10 years.  Ex. U at 11:6-17.  To discredit him, Crown's counsel
26   has accused Mr. Connelly and Sierra Nevada of illegal acts such as providing free beer, even
     though Mr. Bond voluntarily participated in them by having Crown itself provide the beer (not
27   Sierra Nevada) and testified that conduct was legal volume discounting to one of its largest
     customers.  Ex. D at 66:17-67:1.  Crown's attempted tit-for-tat smear campaign has no boundaries
28   or bearing on whether Sierra Nevada had good cause to terminate Crown.

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
LOS ANGELES

Despite Mr. Bond's promise to behave, Sierra Nevada continued to experience problems with him (and, thus, Crown) in 2015 and 2016. Ex. 15; Ex. L at 208:4-8; Ex. ZZZ; Ex. Z. These issues came to a head in October 2016, when Mr. Rosario reported another incident of Mr. Bond's abusive conduct. Ex. J. at 82:11-14, 90:23-91:12, 96:13-18; Ex. RRR. Specifically, after a new product kickoff meeting with the Andy Dempsey and the rest of Crown's sales staff, Dempsey called Rosario into his office to discuss other issues. Ex. J. at 82:18-24. Bond later entered, looked down the hall in both directions to clear the area, and closed the door. *Id.* at 84:3-9. Without any evidence or logical basis, Bond accused Rosario of disclosing Crown's discount pricing to Raley's. Ex. RRR. Bond stood over a seated Rosario, screamed at him, and jabbed his finger in his face. Ex. J at 85:21-86:3. Rosario could smell alcohol on Bond's breath, which increased Rosario's concerns for his own safety. *Id.* Rosario immediately called his two supervisors and sent emails to document Bond's threatening behavior, including to Bond and Dempsey. *Id.* at 90:23-91:12; Ex. ZZZ; Ex. RRR; Ex. VVV. Neither of them responded to Mr. Rosario's email.

Mr. Bond has indisputably been drunk and belligerent to people. He admits to drinking beer and whiskey at Crown. Ex. D at 210:19-22; Ex. E at 214:15-19. Ms. Bond acknowledged that Mr. Bond drinks at work, but she untruthfully testified he limited his drinking to "one or two beers" on "Fridays after work." Ex. F at 90:23-92:11. However, Scott Hosford, Crown's sales manager from approximately 2005 to 2015, testified that he saw Mr. Bond drinking at work "[p]robably four or five times a week" and would start drinking as early as 3:30 in the afternoon. Ex. H at 172:25-173:2, 174:1-4. Mr. Hosford has heard Mr. Bond holler at people "I am going to make your ass bleed." Ex. H at 180:21-22. Mr. Dempsey admitted he heard Mr. Bond make racist jokes using the n-word, which Mr. Bond denied. Ex. G at 198:2-12. Sierra Nevada employees have witnessed this behavior from Mr. Bond as well. Ex. J. at 87:21-88:1; Ex. VVV; Ex. XXX. As noted in Section VI. A., many other people have also witnessed Mr. Bond go "off the wall."

Although Mr. Rosario cannot recall the exact timeline of when he saw which gun at Crown, he does recall some key facts. He recalls several meetings in Mr. Bond's office where he

had a rifle plainly visible, "lean[ed] up against a wall near his desk." Ex. J. at 60:2-61:5.  Mr. Day also saw a rifle in Bond's office, which made him uncomfortable.[5]  Ex. I at 195:10-20. Rosario also recalls "a handgun that shoots shotgun shells," which Bond referred to as "***the judge, jury, and executioner***."  Ex. J at 61:6-10.  Bond admits that he possessed at Crown a gun called "the Judge" that shoots shotgun shells.  Ex. D at 238:24-239:18.  Bond also admits to keeping another pistol, a .38 caliber revolver, in his file cabinet.  *Id.* at 240:24-241:6.  He does not store his weaponry discretely at Crown, as other employees are aware of that gun's presence.  Ex. F. at 86:25-87:4, Ex. G at 200:17-201:9.  Indeed, Mr. Bond is the opposite of discrete, as Tim McGettigan, the regional vice president of sales from Pabst Brewing, testified that he heard that Bond carries a gun.  Ex. S at 42:10-24.  Finally, Bond admits to possessing firearms at Crown, both in his truck and in his office because he hunts and refurbishes guns.  Ex. D. at 242:2-243:2.

### B.   Crown's Sole Proposed Cure Was Inadequate

In response to Sierra Nevada's complaints about Crown in Sierra Nevada's November 2016 termination letters and during its November 15 meeting, Crown steadfastly proposed only a single cure: that "Mr. Bond will no longer initiate communications (either verbal or written) with any of Sierra Nevada's employees or agents," with all direct communications going to Dempsey and Jaye Bond.  Ex 6.  And Sierra Nevada had to clear any visits to Crown so that Mr. Bond could go to his office to avoid contact.  *Id.*  Crown had only until ***January 8, 2017*** under NRS 597.160(3) to fully execute its cure.  Even if the Court were to ignore Sierra Nevada's many other problems with Crown's performance, its proposed cure to address Mr. Bond's conduct fails.

Because he has an explosive temper, drinks at work, and keeps firearms there, the risk is simply too great to just trust that Mr. Bond would stay in his office, perhaps intoxicated, while Sierra Nevada meets with Crown's sales team in the very nearby sales meeting room.  Ex. F at 190:15-19.  Nor did Crown offer to ban firearms from its premises or excessive drinking.  Having been informed of Crown's dangerous situation and having seen no corrective actions, Sierra

---

[5] After Sierra Nevada's witnesses testified about the presence of a rifle in Mr. Bond's office, Crown people testified that he kept a "BB gun" in his office used to shoot pigeons.  Ex. G at 201:10-18; Ex. F at 88:11-17.  When pressed for details about the BB-gun's size and color, Mr. Dempsey initially testified that he did not know the size and the BB-gun was "gun colored."  Ex. G. at 203:13-22.  Mr. Rosario and Mr. Day will testify that they saw a real rifle.

McDermott Will & Emery LLP
Attorneys At Law
Los Angeles

1    Nevada could potentially be liable if anything were to happen to one of its employees at Crown.

2    For that reason, Sierra Nevada no longer sends its employees to Crown and the relationship has

3    deteriorated even further.  Ex. G at144-145; Ex. Z at ¶ 50.  As Crown noted, Sierra Nevada and

4    Crown have a contract, not the Bonds.  ECF No. 14 at 15:4-5.  To address Sierra Nevada's

5    legitimate concerns about safety and professionalism, Crown should have fired its president, Mr.

6    Bond, but did not happen (probably because he owns and runs Crown).  Crown's own expert has

7    fired people for less.  Ex. B at 282:22-283:10.  Crown should have banned firearms and excessive

8    drinking.  Here, too, Crown's expert sees the dangers to the relationship posed by their presence

9    in the workplace.  Ex. B at 283:14-284:1, 261:12-22

10          Furthermore, because Mr. Bond runs Crown, Crown's proposal that Sierra Nevada

11   communicate through Jaye Bond or Dempsey will not work.  Ex. Z at ¶ 50.  Ms. Bond has no

12   sales experience and does not participate in sales, budgeting, marketing, or business plan

13   meetings, which are **the critical** meetings during which Sierra Nevada and Crown collaboratively

14   agree to their collective go-to-market strategies and goals.  Ex. F at 9:7-8, 96:22-97:2, 98:10-

15   25,183:20-184:5, 187:16-188:5; Ex. G at 44:8-45:3; Ex. V. at 11.  She has, in fact, never gone

16   into the market.  Ex. F at 15:3-4.  While Crown's expert opined that Ms. Bond has "equal

17   decision making authority," he admitted that he has no idea what she does at Crown.  Ex. B. at

18   355:14-16.  She runs the front office tasks of beverage procurement and accounting.  Ex. F at

19   141:17.  For his part, Mr. Dempsey is a relatively new sales manager with almost no managerial

20   experience himself or authority to act on Crown's behalf.  Ex. G. at p. 10:8-14:8.  He runs almost

21   everything through Mr. Bond.  *Id.* at 10:3-5, 19:5-8, 44:19-45:3, 45:17-21, 56:10-15.  Mr.

22   Dempsey testified that Crown's "cure" plan was not ideal because "any time you have

23   conversations that don't involve the, one of the owners of the company, there's, there's, I guess, a

24   bit of lag time.  And things need to be, at times, at time an answer is not as readily available as it

25   could be."  *Id.* at 122:15-25.  Sierra Nevada already has problems with Mr. Dempsey's

26   responsiveness, in part because he does not routinely check email or have email on his phone.  *Id.*

27   at 138:4-8.  Nothing meaningful gets done at Crown without Paul Bond's approval.

28

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
LOS ANGELES

**VI.   SIERRA NEVADA HAS ADDITIONAL "GOOD CAUSE" TO TERMINATE CROWN AND CROWN OFFERED NO "CURES"**

Crown proposed no cure whatsoever for its remaining problems.  It simply denied they exist.  In addition, the law provides no cure for a number of Crown's additional problems.

**A.   Mr. Bond's Conduct and Crown's Reputation Materially Impairs Sierra Nevada's Brand**

In the exercise of its "sole judgment," Sierra Nevada may immediately terminate the Distributor Agreement if Crown "has at any time done, or through the performance of any of its obligations under this Agreement has permitted to be done, any act or thing which in any way materially impairs (1) the Company name or the Product," or "(2) Company's image as a producer and distributor of quality beverage products."  Ex. 2 at § 3.b.iii.

Mr. Bond admitted that this provision is clear and reasonable because improper conduct would "hurt the [Sierra Nevada] image and slow sales."  Ex. D. at 207:5-24.  A good brand image is important to the success of the brand.  Ex. V, Ex. B. at 68:22-70:7.  Similarly, it is vitally important for distributors to maintain good relationships with retailers.  Ex. D. at 207:25-208:2; Ex. V.  In fact, Crown's own rebuttal expert, Bill Gialketsis, testified that retail relationships are "***everything***" because retailers determine whether distributors "live or die in the market."  Ex. B at 57:12-19.  Crown's own expert testified that he could not recall a single instance "***ever in your career at Bonanza or in the market generally***" when he heard "***someone in a management position at a distributorship cursed out a retailer***."  Ex. B at 64:4-10.  He admitted that "a firing" may be in order for that conduct.  *Id.* at 62:5-16.  He certainly would not "tolerate" his people using profanity "toward anyone in the market."  *Id.* at 60:20-61:9.  Even Mr. Bond agreed that the use of vulgarity in the trade could harm Sierra Nevada's reputation.  Ex. D at 208:6-9.

Mr. Bond has engaged in aggressive and profane conduct towards retailers and others in the market, harming Sierra Nevada's brand.  For example, Becky Denoyer managed Safeway's liquor purchaser for all of Northern Nevada and part of Northern California for many years.  She recounted one of Crown's merchandisers parking in a handicap spot and simply sitting in his car for 30 to 45 minutes, at which time he then would drive off without doing his work inside the store.  Ex. C at 25:19-26:1.  She complained for several weeks before Cliff Kimmery, one of

McDermott Will & Emery LLP
Attorneys At Law
Los Angeles

1    Crown's two sales managers, showed her a log where she allegedly confirmed the merchandiser

2    had been in the store.  *Id.* at 26:6-10.  She stated that Crown's employee had ***forged*** her signature.

3    *Id.* at 26:11-12.  She received a call from Mr. Bond a few days later, during which she told him

4    what had happened and that she thought it was all handled by the sales manager.  *Id.* at 26:13-17.

5    In response, Mr. Bond got irate and called her either a "***fucking, lying bitch or a lying, fucking***

6    ***bitch***."  *Id.* at 26:18-27:11.  She remembered that the call occurred before 1:00 p.m. and firmly

7    believed Mr. Bond was drunk because he slurred his words.  *Id.* at 27:12-28:4.  She also heard in

8    the trade that Mr. Bond "will pick up a 12-pack and take it back to the office, so usually by early

9    afternoon it's kinda over" and he would "call[] people at night ***just off the wall***."  *Id.* at 28:20-

10   29:10.  She heard Crown commonly referred to as "***Clown Beverages***" due to their below market

11   performance.  *Id.* at 28:14-19, 29:11-16.  She also recounted that a former Crown employee told

12   her that Mr. Bond referred to her generally as "the fucking cunt."  *Id.* at 29:17-30:14.

13        Chris Kahl, an owner of Ole Bridge Pub and Brewer's Cabinet, had similar experiences

14   with Crown and Mr. Bond.  Specifically, Ole Bridge Pub had put in a big order for an upcoming

15   event but Crown failed to deliver.  Ex. Q at 57:1-14.  With the event's kickoff fast approaching,

16   Mr. Kahl decided that he would go to Crown with his manager to pick up the order.  *Id.*  After

17   presenting his invoice, Crown's warehouseman shorted the order.  *Id.* at 59:11-16.  Mr. Bond

18   informed Mr. Kahl that he could not get what he had ordered.  *Id.* at 59:17-21.  Mr. Kahl

19   responded "if this is going to happen, we just won't be ordering as much."  *Id.* at 59:22-23.  Mr.

20   Bond then "got really offended" and "was ***really, really upset***."  *Id.* at 9:24-60:2.  "It was one of

21   those deals where ***I didn't know if we were actually going to physically fight or not***."  *Id*.  Mr.

22   Bond aggressively closed on Mr. Kahl and screamed in his face.  *Id.* at 60:8-61:15.  As a direct

23   result, he "***didn't order like we used to***" from Crown because "***I just really didn't want to deal***

24   ***this that.  That whole – experience anymore***."  *Id.* at 62:10-19.  Clearly Crown's conduct

25   impacted brand sales.  For his part, Mr. Bond denies the encounter occurred.  Ex. D at 219:19-23.

26        Similarly, Matt Weaver, from Morrey Distributing, testified that Mr. Bond has the

27   "reputation for drinking," meaning that "he drinks most of the day."  Ex. T at 57:22-58:6.  He

28   also testified about an incident involving Mr. Bond's volatility at the major Brew HaHa Festival,

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
LOS ANGELES

right after Crown had lost the Lagunitas beer brand.  *Id.* at 25:22-26:3.  Mr. Bond "walked up and introduced himself and then ***threw his business card in the Lagunitas rep's face*** and said I'm, I'm the one you fucked.  And then walked off.  Well, I kind of walked him off."  *Id.* at 26:5-9.

Tim McGettigan of Pabst testified about similar experiences he has had with Mr. Bond. He witnessed Mr. Bond's explosive temper, indicating that "***at meetings that I've been in with him, he – again, he's just toxic – toxic behavior***."  Ex. S at 42:7-9, 17-24.  He also had heard that Mr. Bond "***carries a weapon***."  *Id.* at 42:10.  When Pabst decided not to give Crown the popular new drink *Not Your Father's Root Beer*, Mr. McGettigan delivered the message to Mr. Bond not at Crown's facility but at the ***Reno airport***, because it is "***very public area where I know there's security and, quite frankly law enforcement within earshot distance***."  *Id.* at 42:4-16.  In response, Mr. Bond "got up, pretty much stormed out of the – threw a couple dollars on the table for his cup of coffee and stormed out of the room – or stormed out of the airport."  *Id.* at 41:23-42:2.  Mr. McGettigan testified that Crown is among the worst distributors of the 100s with which he has worked.  *Id.* at 21:11-24.

Bill Fehneman, an area sales manager covering Northern Nevada for Pabst, recalled that over the last six years he has worked with Crown, he has experienced numerous instances of hostile and unprofessional conduct by Mr. Bond.  "For example, in response to my communications regarding Crown's performance issues to Mr. Bond, he would frequently use profanity toward me and others around me in a ***very aggressive, unprofessional manner***."  Ex. W.  He would also call "***late at night yelling and cursing at me***," many times in what Mr. Fehneman believed to be in an intoxicated state "because he would be ***slurring his words***."  *Id.* "[T]here was another time when I had a meeting at Crown where Mr. Bond got ***extremely heated, yelling and cursing at me***," when "***Mr. Bond then aggressively stood up as if he were going to physically confront me and moved into my personal space***."  *Id.*  Mr. Fehneman left "***extremely nervous*** that Mr. Bond was going to following me out to my car since it is ***widely known that Mr. Bond keeps guns at Crown's facility***."  *Id.*  Mr. Fehneman noted that "Mr. Bond's ***explosive temper*** is particularly noticeable when he has been drinking or when the topic deals with ***any criticisms concerning Crown's performance***."  *Id*.  Because of Mr. Bond's tight control over

McDermott Will & Emery LLP
Attorneys At Law
Los Angeles

Crown's operations, Mr. Fehneman has found it "*very difficult to work as a team to resolve problems and properly market Pabst's beer in Crown's territory*."  *Id*.  "Because of the harassment and verbal abuse I have received, I feel *very uncomfortable* going into the Reno market, and Crown in particular, and try to keep my contact with Crown to a minimum."  *Id*. Indeed, "Crown is *the worst distributor* with which I have worked," having never "experienced these types of issues, both in terms of frequency and severity, with other distributors."  *Id*. at ¶ 6.

Crown's single proposed cure of stopping Mr. Bond from communicating directly with Sierra Nevada does nothing to correct the myriad of problems or reputational issues associated with Mr. Bond's unprofessional, vulgar, and abusive behavior.  Mr. Bond is still the face of Crown, which is, in turn, still the face of Sierra Nevada in the market.

**B.      Crown Failed to Provide Sierra Nevada Notices of Change in Ownership and Control as Required Under the Distributor Agreement and Nevada Law.**

The Agreement provides that "Distributor shall not assign or transfer this Agreement or any rights granted or obligations assumed hereunder, without the prior written consent of Company."  Ex. 2 at §6.  Under the contract, "any transfer of ownership or control (by share transfer, merger, consolidation, sale of assets or otherwise) of Distributor shall be deemed an assignment."  *Id*.  Mr. Bond understood that Crown was required to obtain prior written consent before transferring ownership or control of Crown.  Ex. E at 135:15-136:3.

NRS 597.155 also provides that termination "becomes effective on the date the wholesaler receives the notice … if the wholesaler:  …  (j) Or any other person who has a financial interest in the wholesaler has: … Changed or attempted to change the beneficial ownership or control of any such entity, unless the wholesaler first notified the supplier in writing and the supplier has not unreasonably withheld his or her approval."  NRS 597.157(2).  The statute makes clear that there is no right to cure by excluding the change of ownership or control provision from the 90-day notice requirement and right to cure provision of NRS 597.160.  Specifically, subsection 1 provides, "Except as otherwise provided in subsection 2," which contains the provision regarding transfer of ownership or control, a supplier must give notice at least 90 days before termination and an opportunity to cure pursuant to NRS 597.160.  NRS 597.155(1).  The statute recognizes

McDermott Will & Emery LLP
Attorneys At Law
Los Angeles

1  the supplier's important right to vet any potential change in its distributor's ownership or control.

2  Specifically, NRS 597.157 provides that "[a] supplier shall not ***unreasonably withhold or delay***

3  ***approval*** of any assignment, sale or transfer of the stock of a wholesaler…."

4         Sierra Nevada learned through discovery that Crown violated its contractual and statutory

5  obligations to obtain approval from Sierra Nevada of any changes in ownership or control Crown.

6  First, in May 2007, the previous owner, Lawrence Ginochio, transferred the beneficial interest in

7  Crown into a trust and appointed Jaye Bond as the trustee of the trust without written notice to or

8  approval from Sierra Nevada.  Ex. F at 18:10-14, 20:7-11, 25:8-12; Ex. D at 21:15-22; Ex. E at

9  143:9-14, 18:16-19:3, 134:1-12, 147:21-148:3.  Crown will no doubt argue that it provided the

10  required notice through an unsigned letter that Mr. Ginochio allegedly sent to various suppliers in

11  May 2007.  Ex. F at 26:18-27:2; Ex. E at 128:4-129:8, 125:24-126:5.  Even if the draft, unsigned

12  letter from Crown's files were somehow admissible – it is not – it fails to provide any details

13  concerning the transfer of ownership and contains false information.  For example, the draft letter

14  vaguely and falsely states that "Jaye Lynn Bond and Paul M. Bond will be ***purchasing an***

15  ***interest*** in Crown."  Ex. E at 137:25-138:3; 140:24-141:1  In fact, Sierra Nevada learned during

16  Ms. Bond's deposition that Mr. Ginochio transferred all of Crown's stock into a trust in 2007,

17  with her serving as the trustee and receiving as a beneficiary for ***free*** a 1/7 interest in Crown.  Ex.

18  F at 20:7-21:11.  Each of the other six beneficiaries was a Ginochio family member who inherited

19  his or her own 1/7 interest.  *Id.* at 18:10-20:6; Ex. E at 140:12-141:1.  Moreover, the letter

20  provides that there "will be no changes in the day-to-day operations; control; decisions or

21  management" of Crown, i.e., that Mr. Ginochio would continue to run Crown, not Paul Bond.

22  Ex. E at 138:19-23.

23         In January 2014, the Bonds became majority shareholders when they purchased 5/7

24  interests in Crown stock from Mr. Ginochio's children for only $3 million, which they borrowed

25  from a bank and largely paid back.  Ex. F at 22:10-17, 24:17-25:7; Ex. E at 158:9-159:7.  Crown

26  transferred more fractional interests to the Bonds in 2015.  While Crown may produce some

27  documents showing that Sierra Nevada employees may have loosely referred to the Bonds as

28  "owners," Crown indisputably failed to provide Sierra Nevada written notice of these significant

McDermott Will & Emery LLP
Attorneys At Law
Los Angeles

changes in ownership and control and Sierra Nevada never approved of these transactions.  Ex. F at 25:13-16, 51:16-52:10, 28:25-29:15; Ex. E at 141:12-15.  If the Bonds had approached Sierra Nevada in 2014 or 2015 to approve of their transaction to acquire majority ownership in Crown, Sierra Nevada would have ***reasonably*** disapproved.  Instead, the Bonds quietly acquired majority ownership, enabling Mr. Bond to act without the possibility of being fired.  The Court should find that Crown failed to comply with its duties to Sierra Nevada, which supports termination.

### C.  Crown Failed to Maintain Valid Licenses for Many Years and Failed to Inform Sierra Nevada of this Serious Failure

Nevada state law and Washoe County's code require a person – including an owner or managing officer of a corporation – to be licensed before engaging in business as a wholesaler of alcohol beverages.  The state defines a "wholesale dealer" or "wholesaler" as "a person licensed to sell liquor as it is originally packaged to retail liquor stores or to another licensed wholesaler, but not to sell to the consumer or general public."  NRS 369.130; 597.150.  A person is prohibited from broadly "engaging in" beer wholesaler's business in Nevada unless the person first obtains a license.  *Id*. 369.180(1)(c), 369.181(2); 369.490(1)(b); *see also* Washoe Cnty. Code §§ 25.015(1); 25.4341, 30.110.  Nevada law requires a corporate license applicant to list in its application personal information concerning its key officers, including the president and secretary (i.e., the positions held by Paul and Jaye Bond, respectively, from 2007-2012).  NRS 369.190(2)(b)(2); Washoe Cnty. Code §§ 25.4342(2)(b)(2), 30.110; Ex. F at 18:3-9; Ex. D at 21:9-11.  The rule enables the regulators to vet the applicant's officers to confirm their qualifications to engage in an alcohol-related business.  Washoe Cnty. Code § 25.023(2).

Similarly, the Agreement requires Crown to maintain all necessary licenses and permits Sierra Nevada to terminate if "***Distributor ceases to have in effect a valid Federal, state or local license***, permit or consent required or necessary for it to fully perform under this Agreement" or performs any act violating "***any Federal or state law, regardless of whether such violation is prosecuted***."  Ex. 2 at § 3(b)(ii)-(iii).

Sierra Nevada learned during discovery that from 2007, when Mr. Ginochio (Crown's prior owner) passed away, until 2013, when Paul and Jaye Bond applied for a new license

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
LOS ANGELES

1  disclosing their leadership positions at Crown, the Bonds were not licensed to sell beer.  Ex. F at

2  18:8-19:4, 20:10-15; Ex. D 21:9-11, 44:24-46:11.  Under state and county law, Crown's license

3  under the Ginochios' ownership was not transferable to the Bonds.  NRS 369.220(3); Washoe

4  Cnty. Code §§ 25.021, 30.270(3).  The Bonds did not apply for a new license in 2007 or

5  otherwise notify the alcohol licensing authorities of Crown's personnel and ownership changes.

6  Instead, upon Mr. Ginochio's death, Crown continued operating "just like it always did."

7  Ex. F at 20:7-9; Ex. E at 30:14-20, 37:1-11.  Further, Mr. Bond admitted in his deposition that he

8  knew Crown was required to be licensed and that Crown was obligated to know its licensing

9  obligations.  Ex. D. at 14:20-15:1, 48:22-49:11, 55:15-19; Ex. E at 149:23-150:11.  Yet Crown

10  lacked the required licenses from 2007 to 2013.  Ex. SSS.  Mr. Bond admitted that, at the time he

11  submitted the application for the state and county approvals in 2013, Crown did not have the

12  required state and Washoe County licenses in his name.  Ex. D. at 45:2-14, 52:3-18.  According

13  to Mr. Bond, "*sometimes things went through the cracks*."  *Id.* at 47:19-20.  But even after the

14  Bonds learned that Crown was not properly licensed, they kept *illegally* ordering and selling

15  Sierra Nevada beer in Nevada and kept their licensing problem hidden from Sierra Nevada

16  despite Crown's contractual obligation to stay licensed and comply with the law.  Ex. D at 47:2-6;

17  Ex. E at 16:4-6, 20:22-25.  The Court should find that Crown breached its contractual and

18  statutory licensing duties to Sierra Nevada, which serves as a basis for termination.

19  **D.**  **Crown Falsely Billed Sierra Nevada**

20  Nevada law permits a supplier to immediately terminate a wholesaler if the

21  wholesaler"[h]as committed fraud or has made a *material misrepresentation* in his or her

22  dealings with the supplier or the products of the supplier."  NRS 597.155(2)(f).  In 2013-2014,

23  Sierra Nevada discovered that Crown had been systematically taking discounts from Sierra

24  Nevada and not passing them onto retailers for several years but billing back Sierra Nevada as if

25  Crown had passed them through.  Ex. N at 20:1-12.  This is systematic stealing, as it is industry

26  standard to bill back a discount only if the distributor actually provides it to the retailer.  Ex. B

27  222:2-7.  Indeed, Crown's expert testified that his distributorship would not bill back discounts

28  not passed onto retailers.  *Id.*  Sierra Nevada has never experienced this type of systematic

stealing with any other distributor.  Ex. V at 15.  For his part, Mr. Bond defiantly admitted that Crown's practice was intentional—he "played it as a wash" to offset other costs Crown allegedly incurred.  Ex. PPP.  Sierra Nevada's Joe Whitney and Matt Foster considered this practice a clear case of stealing and wished to terminate Crown.  Ex. L at 118:22-120:4; Ex. M at 108:23-25; 113:2-10.  The parties, however, agreed to continue the relationship after Crown paid back a portion of the stolen monies, but Sierra Nevada was forced to spend approximately $100,000 on new software designed to prevent this from happening again.  Ex. K at 125:15-126:9; Ex. V at 15.  There are, however, still certain invoices that Crown must submit manually.  *Id*.  And Sierra Nevada continues to encounter issues with Crown's submissions, including duplicate invoices, improper amounts, and inadequate documentation.  *Id.* at 116:10-25, 120:9-18, 125:20-126:7, 132:16-21; Ex. QQQ.  Sierra Nevada no longer trusts Crown to be diligent and honest, adding to the dysfunctionality of the relationship.

### E.      Crown Failed to Provide a Competitive Level of Service

The Agreement requires Crown to "exercise its *best efforts* to promote, sell and service" Sierra Nevada.  Ex. 3 at ¶ 1.  The Agreement also requires Crown to (1) "maintain prompt delivery service compatible with *good business practices* and the *requirements of its customers*, such *delivery service to be no less prompt and effective than that of Distributor's competitors*"; (2) "promote the sale of the Product in the Territory in an aggressive and diligent manner, including, without limitation, causing its salesmen personally to call upon all customers in the Territory at customary intervals and maintaining inventories of the Product at all times (of all types) adequate to service the requirements and satisfy the demands of the market in the Territory"; and (3)  "at all times cooperate with Company in effectuating Company's promotions and merchandising programs in the Territory. "  Ex. 3 at ¶¶ 2(a)-(b), (d).   Mr. Bond admitted that these terms are reasonable and essential to Sierra Nevada's success.  Ex. D at 30:11-23, 36:6-9, 98:10-99:17, 115:23-117:15.  As part of these requirements, Sierra Nevada also requires its distributors to meet specified brand and quality standards.  The brand standards are routinely communicated to distributors to ensure that they competitively promote Sierra Nevada.  Ex. L at 149:3-153:7.  The quality standards ensure that consumers receive fresh beer.  Ex. E at 24:4-13;

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
LOS ANGELES

1  Ex. D 175:25-176:8.  Sierra Nevada requires all of its Nevada distributors to comply with these

2  requirements.  Ex. N at 67:3-68:3; Ex. M at 128:13-19; 130:3-12.

3            1.       **Crown Failed to Adequately Service Off-Premise (Stores) and On-
                      Premise (Bars, Restaurants) Accounts**

4  According to *its* expert, Crown should treat its relationships with retailers as if they decide

5  whether "you live or die."  Ex. B at 57:12-19.  But retailers consistently complained about

6  Crown's poor service levels, evidencing its failure to use its "best efforts" to promote the Sierra

7  Nevada product, meet "the requirements of its customers," and maintain "delivery service to be

8  no less prompt and effective than that of Distributor's competitors."  Ex. 3 at ¶¶ 2(a)-(b), (d).

9  For example, Sierra Nevada fields constant complaints about Crown's service levels from

10 Safeway, Wal-Mart, and Raley's, which are three of the largest retailers in Crown's market

11 constituting approximately 20 percent of Sierra Nevada's sales.  Ex. Z at ¶¶ 3, 51; Exs. AA-ZZ.

12 Safeway's former liquor manager, Becky Denoyer, testified that Crown was the worst distributor

13 with which she has ever worked and would grade its service level an "F."  Ex. C at 31:25-32:5;

14 31:13-23.  She recounted that Crown placed displays in the wrong area, consistently set up

15 displays that "weren't eye appealing."  *Id.* at 34:2-16.  She also testified that Crown placed

16 inadequate blind orders,[6] was the only distributor who would not provide credits for OOC beer or

17 breakage, was not aggressive selling Sierra Nevada product, and even refused to provide Safeway

18 with a new seasonal Sierra Nevada product because Crown still had inventory of a previous

19 seasonal.  *Id.* at 20:16-19; 21:8-22:15; 34:17-35:2.  Wal-Mart's market manager, Bruce Barlow,

20 also complained of Crown's orders and forecasts for deliveries as being "poor."  Ex. V at 9; Exs.

21 AA, FF, GG, JJ, NN, PP, SS.  Similarly, Joe Mowery a district team leader from Raley's, testified

22 that Crown was the worst distributor and identified issues with Crown's inadequate delivery

23 frequency, blind ordering, and "sad" display execution.  Ex. R at 14:8-15:1, 93:10-94:6, 181:16-

24 183:18, 186:19-21; Ex. KK, OO, ZZ.  Retailers also referred to Crown as "Clown beverages" and

25

26

27 ───────────────
   [6] A blind order occurs when a distributor, like Crown, delivers beer to a store without visiting the
28 store **the day before** the delivery to check on the store's inventory levels.  Blind orders lead to
   out-of-stock problems.

McDermott Will & Emery LLP
Attorneys At Law
Los Angeles

other insults in light of Crown's unsophisticated operation.  Ex. C. at 28:14-19, 29:11-16; Ex. U at 76:10-25.

On-premise accounts have experienced problems with Crown's services levels as well. Sierra Tap House, for example, has long perceived Crown to be the weakest distributor and has had delivery problems, including lying about order status.  Exs. VV-WW.  BJs Restaurant has had issues with Crown's cleaning of draft lines, which, as a quality standard, Crown must do every two weeks to keep the beer tasting fresh.  Exs. CC-DD.  Here, too, Crown has no written policy in place and Sierra Nevada frequently spots dirty draft lines in the market.  Exs. BB, MM.

Nevertheless, Crown argues that because Sierra Nevada's sales volume increased in 2014 and 2015, Crown must have adequately serviced retailers.  ECF No. 14 at p. 16.  This superficial argument ignores that several other factors.  First, the Sierra Nevada brand as a whole grew during that time period and consistently performs better in Crown's territory owing to its proximity to Sierra Nevada's Chico, California brewery.  Ex. D at 173:10-22.  Sierra Nevada is practically a local beer in Crown's territory, which is seated in the Sierra Nevada mountains.  Ex. L at 140:2-23; Ex. D at 174:11-17.  Moreover, Sierra Nevada is a strong craft brand on its own and Reno is a strong craft beer market relative to other regions.  Ex. D at 174:7-10.  Second, Sierra Nevada has paid to have sales representatives in Crown's market for many years.  Mr. Rosario, for example, has worked Crown's territory since 2013.  He is routinely credited with the success of the majority if not all of the major accounts in Crown's market.  Ms. Denoyer of Safeway testified that Rosario was "doing Crown's job" and that Sierra Nevada sales were "due directly to Brian Rosario."  Ex. C at 18:2-8, 35:12-36:3, 49:9-12.  Mr. Mowery of Raley's similarly testified that its increases in sales were attributable to Rosario, who presented a marketing plan "all tied up with a bow and handed [it to] Crown."  Ex. R at 201:13-202:7. Likewise, at Wal-Mart, Rosario was a "selling machine" and secured "thousand-case displays, which [was] 600 cases bigger than any else has ever sold."  Ex. L at 183:15-184:6.  His efforts turned Crown's Wal-Mart locations into some of the highest selling locations nationwide.  *Id.* Crown's sales volumes could have been even been greater if it had achieved Sierra Nevada's

McDermott Will & Emery LLP
Attorneys At Law
Los Angeles

1  brand and quality standards and invested marketing dollars on the brand consistent with industry

2  standards.  Ex. B at 259:3-18; Ex. P at 106:20-23.[7]

3           2.       **Crown Failed to Meet Quality Assurance Standards**

4       Product quality is of the utmost importance to Sierra Nevada, as is the case with many

5  craft and other brands.  Ex. V at 6.  In fact, Crown's expert admitted that a failure to meet quality

6  assurance standards justifies termination.  Ex. B at 123:17-20.

7       As mentioned above, Sierra Nevada requires distributors to meet certain quality standards

8  designed to ensure that consumers receive Sierra Nevada product as intended – fresh.  Ex. E at

9  24:4-13; Ex. D 175:25-176:8.  To do this, Sierra Nevada determines when products will no longer

10 have proper taste (generally 150 days after bottling), at which point the product becomes OOC

11 and Crown pull it from the market.  Ex. O at 24:5-10.  To avoid OOC product, distributors must

12 properly rotate product.  Ex. B. at 150:9-13.  It is industry standard for distributors to implement

13 written policies and systematic programs to avoid OOC product and ensure proper rotation.  *See*

14 Ex. V at 10; Ex. T at 56:22-57:7; Ex. B at 36:20-38:17.  Indeed, Crown's industry expert testified

15 that his Nevada distributorship, Bonanza Beverage, "constantly" audits delivery routes checking

16 for OOC product.  Ex. B at 110:2-112:3.  During the audit, Bonanza inspects "every account on

17 the route," and, at the conclusion, it generates a report of every instance of OOC product.  *Id.*  If

18 the salesperson receives a failing grade, Bonanza has a "progressive discipline" program in place

19 that ultimately results in termination after four failing grades.  *Id.* at 42:3-17.

20      Sierra Nevada consistently found OOC product in Crown's market.  Ex. N at 180:25-

21 182:14; Ex. Z at ¶ 30; Exs. AAA-EEE.  Crown disingenuously contends in its motion that it

22 "worked diligently to reduce the presence of Sierra Nevada's products that are past Sierra

23 Nevada's expiration date" and "takes meticulous precautions to remove OOC products." ECF No.

24 14 at p. 20.  Crown failed to identify any of its specific "meticulous precautions" because it has

25 none.  Mr. Bond testified in his declaration that "Crown instituted a program where Crown's sales

26 

[7] One of Sierra Nevada's primary competitors in Crown's market is Lagunitas.  Ex. 1 at pp.
27 155:7-20.  Lagunitas dropped Crown as its distributor in 2011 with anemic sells.  Ex. T at 18:6-
11.  In four years with a competitor distributor, Morrey, Lagunitas sales went from approximately
28 6,000 to over 100,000 cases in the region.  *Id.*

McDermott Will & Emery LLP
Attorneys At Law
Los Angeles

1   managers and/or other administrative employees survey approximately 50 accounts on average

2   per week." Ex. 1 at ¶ 16.  But Mr. Bond later admitted during his deposition that Crown reviews

3   about only 70 of Crown's 1,300 accounts a month, he does not review the reports, and Crown has

4   no meaningful follow-up. Ex. D at 142:2-3.  Mr. Dempsey admitted that reviewing 50 to 75

5   accounts a month was "more realistic." Ex G at 85:4-15.  But Crown's own documents show

6   even fewer inspections, as low as 32 *per month*. Ex. YYY.  Crown's expert admitted that visiting

7   only 40 accounts a month was "light." Ex. B at 317:2-15.  While Crown may argue that it

8   "instituted" a program, it has utterly failed to execute it and fix its OOC problem.  Its citation to

9   one "compliment" in September 2016, where Sierra Nevada merely "acknowledged Crown's

10  efforts in minimization OOC products" does not change this fact.  Crown's employees are, in

11  fact, incentivized to leave OOC product in the market, because when they pull OOC product and

12  return it to Crown, Mr. Bond docks their pay. Ex. D at 148:22-149:1.  Sierra Nevada consistently

13  found OOC product in Crown's territory even after termination.[8] Ex. Z at ¶ 30.

### 3.   Crown Failed to Meet Brand Standards

15      Sierra Nevada requires its distributors to comply with certain brand standards, as

16  summarized above, which ensure that it is competitively presented in the market. Ex. L at 149:3-

17  153:17.  These requirements are not only objective and clear, but are also commonly imposed on

18  distributors by suppliers in the beer industry. Ex. B at 101:18-103:16; 314:7-13; Ex. E at 253:3-

19  254:20, 260:413; Ex. V at 6-7.

20      Crown's contentions that the brand standards are "entirely new" and "have yet to be even

21  communicated to Crown" are false. ECF No. 14 at 16-17.  Sierra Nevada consistently

22  communicated these standards to Crown. Ex. E at 257:11-258:10; Ex. H at 14:9-13, 16-5-9; Ex. I

23  at 153:23-154:6; Ex. M at 169:5-8; Ex. Z at ¶ 36; Exs. FFF-QQQ.  In fact, the brand standards are

24  even referenced in five of the exhibits cited by Crown in its motion.  *See* Ex. 9 at p. 6; Ex. 13 at p.

25  13; Ex. 14 at p. 7; Ex. 20 at p. 8; Ex. 23 at p. 1.  And while Sierra Nevada periodically changes

26

27  ───────────────

    [8] Crown may cite to certain historical documents where it scored better than other distributors on
    OOC beer (almost all from other regions, further from the brewery).  But when Sierra Nevada

28  approached other distributors to correct OOC problems, they resolved them immediately.  Ex. N.
    at 181: 15-182:17.  Crown has not, by contrast.

how it measures performance of the standards, the standards and their objective fundamentally remain the same.  Ex. L at 150:1-53:9; Ex. M at 167:4-19; Ex. N 22:3-24:21, 184:2-18.  For example, in October 2016, Sierra Nevada introduced a new system to measure brand standards.  Ex. L at 151:23:-152:13; Ex. I at 153:6-15.  This new system measured the presence of OOC product, which was already a part of Sierra Nevada's quality standards, distribution (measured by the number of bottle facings), display/features (measured by the number of cases present), and POS execution (measured by the number of POS material).  Ex. N at 21:19-23, 184:2-18.  For comparison, the previous system contained only one different metric: shelf-position, which required Sierra Nevada product to be placed at "eye level," and a slightly different metric for distribution, which a measured the number of skus (different styles) present rather than bottle facings.  *See id.*; Ex. 13 at p. 13.  The previous system implemented the same display and POS standards as the October 2016 system.  Ex. N at 184:2-18; Ex. 13 at p. 13.  And at the time of termination, Crown failed to meet any of Sierra Nevada's brand standards.  *See* Exs. 5, 8.  This, of course, was not a new issue for Crown.  Ex. 14 at p. 7; Ex. 9 at p. 6; Ex. 20 at p. 8; Ex. 23.  And Crown employees admitted that Sierra Nevada's standards are clear.  Ex. E at 253:3-254:20, 260:413; Ex. H at 31:21-32:13.  Yet leading up to the termination, Crown consistently failed to meet its brand standards despite constant feedback from Sierra Nevada.  Exs. 5, 8, 23.  Crown's failure to meet brand standards evidences its absence of "best efforts," justifying Sierra Nevada's termination.

### 4.   **Crown's Denial of Poor Performance Rings Hollow**

Several craft suppliers have outright ended or sought to end their relationships with Crown based on poor performance:  Lagunitas, Alaskan Brewing Company, and Deschutes.  Ex. E at 118:21-119:16, 152:13-153:11.  Crown has also poorly serviced Pabst, including by failing to ensure adequate stock levels of product and the constant presence of OOC product in the market.  Ex. W.  In response, Pabst awards new products to an entirely different distributor within Crown's region.  Ex. S at 28:15-20.

Crown is the author of its own demise.  Its leadership has no managerial education or training, and the face of Crown, Mr. Bond, has a reputation as a hot head and a "drinker."  Ex. T

McDermott Will & Emery LLP
Attorneys At Law
Los Angeles

at 57:24-58:6; Ex. S 42:17-19.  Crown has no meaningful written policies.  It has minimal

community involvement.  Ex. V at 12-13.  It even lacks a social media and internet presence,

which its own expert admitted craft breweries value.  Ex. V at 11-12; Ex. B at. 330:9-18.  Crown

has a weak brand portfolio, which impacts its market penetration.  Ex. V at 18-19.  It undertakes

minimal to no efforts to acquire new brands.  Ex. E at 170:22-171:16.  At bottom, Crown is not

built to compete with other distributors, and, as a result, it cannot provide Sierra Nevada with a

competitive level of service.

## VII.   CROWN CANNOT PREVAIL ON ITS IMPLIED CONTRACT CLAIMS

Crown failed to present *evidence* showing a likelihood of success on the merits of its

remaining claims for contractual and tortious breach of good faith and fair dealing (Third &

Fourth Claims).  Breach of the covenant of good faith and fair dealing occurs when "one party to

the contract *deliberately* countervenes the intention and spirit of the contract." *Hilton Hotels*

*Corp. v. Butch Lewis Prods., Inc.*, 107 Nev. 226, 232 (1991).  Obligations "implied" by the

covenant, however, are "circumscribed by the purposes and express terms of the contract."

*Carma Developers, Inc. v. Marathon Dev. Cal., Inc.*, 2 Cal. 4th 342, 373 (1992).  That is, "the

implied covenant of good faith and fair dealing may not be used to imply a term that is

contradicted by an express term of the contract."  *Kuiava v. Kwasniewski*, 126 Nev. 731 (2010)

(*citing Kucharczyk v. Regents of Univ. of Cal.*, 946 F. Supp. 1419, 1432 (N.D. Cal. 1996).  Crown

submitted no evidence that Sierra Nevada "deliberately" violated an "implied" contract term.

## VIII.   CROWN FAILED TO ESTABLISH IRREPARABLE HARM

Irreparable harm is harm for which there is no adequate legal remedy, such as an award of

damages.  *Backman v. Goggin*, 2016 WL 4577402 (D. Nev. Aug. 31, 2016).  *First,* Crown admits

that the loss of Sierra Nevada product creates merely a "risk" of irreparable harm – not actual

immediate harm.  ECF No. 15 at p. 18.  Crown alleges that it will suffer "loss of client

confidences," "loss of profit," "loss of market share, loss of reputation and good will, and loss of

future business."  ECF No. 14 at p. 28.  But the totality of Crown's evidence that it will suffer this

"harm" is Mr. Bond's unsupported belief that (1) "Crown will suffer loss of goodwill and

damage"; and (2) "customers will believe that Crown did something wrong in its performance of

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
LOS ANGELES

1   the Sierra Nevada franchises." Ex. 1 at ¶¶ 40-41; Ex. E at 83:1-6, 84:22-85:4.  These conclusory

2   statements that Crown would suffer "loss of reputation, competitiveness, and goodwill" are

3   insufficient.  *Oakland Tribune, Inc. v. Chronicle Pub. Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985).

4   *Second*, Crown failed to show that monetary damages are inadequate.  *Aurora World, Inc. v. Ty*

5   *Inc.*, 719 F. Supp. 2d 1115, 1169 (C.D. Cal. 2009).  Crown has already obtained an offer from

6   another distributor to buy Sierra Nevada's rights, which Crown contended reflects a fair market

7   value for them.  Ex. TTT.  In that light, this Court should not issue an injunction "requiring the

8   two parties to continue in perpetuity to do business with each over."  *O. M. Droney Beverage Co.*

9   *v. Miller Brewing Co.*, 365 F. Supp. 1067, 1070 (D. Minn. 1973).  In short, Crown fails to

10  "adequately explain[] why monetary damages are not sufficient"  *Id.*

## IX.   **CONCLUSION**

12          For the foregoing reasons, Sierra Nevada respectfully requests that the Court deny

13  Crown's motion.  Sierra Nevada had ample "good cause" to end its dysfunctional relationship

14  with Crown on November 9, 2016, based on its failure to perform several "essential and

15  reasonable requirements" and other legal violations, and, even where Crown had a right to cure

16  by January 8, 2017, Crown failed to do so.  In accordance with *American Mart*, this Court should

17  validate Sierra Nevada's good faith business decision to part ways with Crown because the

18  decision was not based on "arbitrary, capricious, irrational, unreasonable or irrelevant" factors.

Dated: April 27, 2017

McDERMOTT WILL & EMERY LLP


By:  /s/ Richard K. Welsh

Richard K. Welsh (*pro hac vice*)
2049 Century Park East, Suite 3800
Los Angeles, California  90067

*Counsel for Defendant*
*Sierra Nevada Brewing Co.*

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
LOS ANGELES

McDermott Will & Emery LLP
Attorneys At Law
Los Angeles

## INDEX OF EXHIBITS

| EXHIBIT | DESCRIPTION | NUMBER OF PAGES |
|:---:|:---|:---:|
| A | December 15 Letter from J. Bond to J. Whitney | 6 |
| B | Excerpts from the Deposition of B. Gialketsis | 36 |
| C | Excerpts from the Deposition of B. Denoyer | 20 |
| D | Excerpts from the Deposition of P. Bond | 53 |
| E | Excerpts from the Deposition of Crown's 30(b)(6) Witness | 45 |
| F | Excerpts from the Deposition of J. Bond | 38 |
| G | Excerpts from the Deposition of A. Dempsey | 18 |
| H | Excerpts from the Deposition of S. Hosford | 13 |
| I | Excerpts from the Deposition of Sierra Nevada's 30(b)(6) Witness | 7 |
| J | Excerpts from the Deposition of Brian Rosario | 16 |
| K | Excerpts from the Deposition of Tim Day | 7 |
| L | Excerpts from the Deposition of J. Whitney | 19 |
| M | Excerpts from the Deposition of M. Foster | 10 |
| N | Excerpts from the Deposition of S. Robinson | 15 |
| O | Excerpts from the Deposition of T. Lowe | 5 |
| P | Excerpts from the Deposition of K. Clements | 4 |

| Q | Excerpts from the Deposition of C. Kahl | 9 |
|---|---|---|
| R | Excerpts from the Deposition of J. Mowery | 13 |
| S | Excerpts from the Deposition of T. McGettigan | 10 |
| T | Excerpts from the Deposition of M. Weaver | 9 |
| U | Excerpts from the Deposition of Mike Connolly | 5 |
| V | Sierra Nevada's Expert Witness Disclosure and Report | 30 |
| W | Declaration of William Fehneman | 4 |
| X | Declaration of Nick Lundquist | 3 |
| Y | Declaration of Kate Hammond | 5 |
| Z | Declaration of Tim Day | 7 |
| AA | Dec. 8, 2013 email correspondence | 2 |
| BB | Mar. 26, 2014 email correspondence | 3 |
| CC | June 13, 2014 email correspondence | 3 |
| DD | June 30, 2014 email correspondence | 2 |
| EE | Sept. 3, 2014 email correspondence | 7 |
| FF | Nov. 30, 2014 email correspondence | 2 |
| GG | Nov. 30, 2014 email correspondence | 2 |
| HH | Jan. 9, 2015 email correspondence | 5 |
| II | July 2, 2015 email correspondence | 3 |
| JJ | Sept. 30, 2015 email correspondence | 3 |
| KK | Aug. 28, 2015 email correspondence | 3 |
| LL | Nov. 30, 2015 email correspondence | 3 |
| MM | Oct. 2, 2015 email correspondence | 3 |
| NN | June 30, 2015 email correspondence | 3 |

McDermott Will & Emery LLP
Attorneys At Law
Los Angeles

| OO | July 1, 2015 email correspondence | 2 |
|---|---|---|
| PP | Sept. 2, 2015 email correspondence | 4 |
| QQ | Nov. 4, 2015 email correspondence | 2 |
| RR | Nov. 19, 2015 email correspondence | 5 |
| SS | Nov. 30, 2015 email correspondence | 3 |
| TT | Dec. 2, 2015 email correspondence | 2 |
| UU | Jan. 13, 2016 email correspondence | 4 |
| VV | Jan. 26, 2016 email correspondence | 4 |
| WW | Jan. 27, 2016 email correspondence | 3 |
| XX | Feb. 4, 2016 email correspondence | 2 |
| YY | May 13, 2016 email correspondence | 5 |
| ZZ | Oct. 12, 2016 email correspondence | 5 |
| AAA | March 18, 2015 email correspondence | 4 |
| BBB | Apr. 13, 2015 email correspondence | 5 |
| CCC | Apr. 24, 2014 email correspondence | 11 |
| DDD | Sept. 3, 2015 email correspondence | 4 |
| EEE | Sept. 30, 2016 email correspondence | 16 |
| FFF | Dec. 19, 2014 email correspondence | 3 |
| GGG | June 15, 2016 email correspondence | 5 |
| HHH | June 22, 2016 email correspondence | 5 |
| III | Mar. 19, 2016 email correspondence | 27 |
| JJJ | Mar. 19, 2016 email correspondence | 5 |
| KKK | Feb. 5, 2016 email correspondence | 6 |
| LLL | Oct. 10, 2016 email correspondence | 68 |
| MMM | June 29, 2014 email correspondence | 4 |
| NNN | June 30, 2015 email correspondence | 3 |
| OOO | June 30, 2015 email correspondence | 4 |

| PPP | January 2014 email correspondence | 7 |
|-----|-----------------------------------|---|
| QQQ | Mar. 14, 2016 email correspondence | 4 |
| RRR | B. Rosario, Exhibit 11 | 4 |
| SSS | P. Bond, Exhibit 6 | 19 |
| TTT | Supplemental Answers to Interrogatory Responses Set One | 15 |
| UUU | S. Robinson, Exhibit 14 | 3 |
| VVV | S. Robinson, Exhibit 23 | 3 |
| WWW | T. Day Exhibit 4 | 12 |
| XXX | T. Day Exhibit, 27 | 5 |
| YYY | A. Dempsey, Exhibit 4 | 2 |
| ZZZ | A. Dempsey, Exhibit 14 | 4 |

McDermott Will & Emery LLP
Attorneys At Law
Los Angeles