# EXHIBIT B

# Excerpts from the Deposition of B. Gialketsis

# EXHIBIT B

# Excerpts from the Deposition of B. Gialketsis

1              UNITED STATES DISTRICT COURT

2                   DISTRICT OF NEVADA

3                   *  *  *  *  *  *

4

5    CROWN BEVERAGES, INC., a
     Nevada corporation,
6
              Plaintiff,
7                                      Case No.
          vs.                 3:16-cv-00695-MMD-VPC
8
     SIERRA NEVADA BREWING CO., a
9    California corporation; DOES
     I through X, inclusive,
10
              Defendants.
11    _____

12

13

14            VIDEOTAPED DEPOSITION OF

15                BILL GIALKETSIS

16               Las Vegas, Nevada

17                April 13, 2017

18                  9:03 a.m.

19

20

21

22

23        Reported by: Heidi K. Konsten, RPR, CCR
          Nevada CCR No. 845 - NCRA RPR No. 816435
24                JOB NO. 385089

25

BILL GIALKETSIS - 04/13/2017

```
 1              Videotaped deposition of BILL GIALKETSIS,

 2    Volume 1, taken at 3883 Howard Hughes Parkway,

 3    Suite 1100, Las Vegas, Nevada, on Thursday, April

 4    13, 2017, at 9:03 a.m., before Heidi K. Konsten,

 5    Certified Court Reporter in and for the State of

 6    Nevada.

 7

 8                APPEARANCES OF COUNSEL

 9    For the Plaintiff:

10            LEIF REID, ESQ.
              NICOLE SCOTT, ESQ.
11            Lewis Roca Rothgerber Christie
              50 West Liberty
12            Suite 410
              Reno, Nevada 89501
13            (775) 823-2900
              (775) 823-2929 Fax
14            lreid@lrrc.com

15    For the Defendants:

16            RICHARD K. WELSH, ESQ.
              JEFFREY A. ZUIDEMA, ESQ.
17            McDermott Will & Emery
              2049 Century Park East
18            Suite 3800
              Los Angeles, California 90067
19            (310) 227-4110
              (310) 277-4730 Fax
20            rwelsh@mwe.com

21    Also present:   Terrell Holloway, Videographer

22

23                    * * * * * *

24

25
```

BILL GIALKETSIS - 04/13/2017

1  yeah, we're going to get -- you know, we didn't

2  say anything really about it.

3      **Q    All right.  In terms of the -- how**

4  **out-of-code beer is handled, what did Mr. Bond**

5  **tell you?**

6      A    Well, he explained to me how they -- how

7  they monitor the accounts, how the salesmen go

8  into the accounts, how they check -- they're

9  expected to check the code dates.  His -- his

10  process for picking up the beer.  How -- how

11  information about monitoring and code dates is --

12  is dispensed in the organization.  We talked a

13  little about the level of training that his people

14  have, those -- those things.

15      **Q    How did Crown's process compare to**

16  **Bonanza's process for out-of-code beer?**

17      A    In a lot of ways, it -- it's the same.

18  In a lot of ways, it's the same.  In some ways,

19  it's not.

20      **Q    How did it differ?**

21      A    I think we have more formal policies,

22  you might say.  I think -- you know, one thing I

23  didn't really ask him about is how he -- who picks

24  up the beer or who's responsible for picking up

25  the beer and who's -- who's -- you know, my

BILL GIALKETSIS - 04/13/2017

1    impression that I gathered from him was that the

2    salesmen do most of the work.  That was my

3    impression.  I'm not sure that's 100 percent

4    correct.

5              In my distributorship, I actually have a

6    team of people that -- that go out and -- and

7    audit accounts.  In -- in some of the big hotels,

8    I also have teams of people that go into the

9    hotels and rotate all of the locations, because

10   it's just not possible for a single salesman to do

11   that.

12             Now, I didn't -- I got the impression

13   from him that -- that the work -- most of the work

14   was done by the salesmen, but I'm not sure about

15   that.

16   **Q    In terms of the -- in terms of the Reno**

17   **market, are you familiar with what Morrey**

18   **Distributing or New West or Southern Wine &**

19   **Spirits up in the Reno area do to -- in response**

20   **to -- or to monitor or respond to out-of-code**

21   **product issues?**

22        A    No, I'm not.

23   **Q    All right.  And let's go into the**

24   **written -- the formal written policies.**

25   **Do you think those policies that Bonanza**

BILL GIALKETSIS - 04/13/2017

Page 38

1  has are useful?

2       A    I do.

3       Q    **Why?**

4       A    Well, I just think -- I think it's

5  better to get it on record, and I think it's

6  better -- it just puts people on notice.  It's

7  better than just -- for the same reason, it's

8  better to get a signature on a document saying

9  that you showed something to somebody than to just

10 tell them.

11           Now, that's -- now, those are hard

12 lessons to learn sometimes.  I mean, we've

13 definitely been in the position where we've --

14 we've done it by the seat of our pants, so to

15 speak.  And it served us well for many, many, many

16 years.  But, you know, I think it's better to have

17 a written policy.

18      Q    **In the Las Vegas market, do most of the**

19 **distributors have written policies and teams of**

20 **lawyers?**

21      A    I don't know.

22      Q    **You don't know?**

23      A    Lawyers?

24      Q    **I meant to say -- did I say lawyers?**

25           MR. REID:  You did.

Page 42

1    charges them for every case of old beer that they

2    find.

3        Q    Do you -- do you think that provides a

4    salesman an incentive to either leave the beer on

5    the market or to just pay full retail themselves

6    for it?

7        A    A good salesman, if he cleans up his

8    route, will pay for some of the beer.  Does it

9    provide an incentive?  Absolutely not.  I don't

10   think so.

11           You know, the way we do it, I -- you

12   know, I did not discuss with Paul what his

13   progressive discipline policy is in this regard.

14   But with us, you get -- one strike, you get

15   written up.  Two strikes, you get written up

16   again.  Third strike, you get suspended.  Fourth

17   time, you lose your job.  That's how we do it.

18       Q    Got it.

19           Do you know if Crown has -- in all of

20   the documents you've looked at -- has a policy

21   like that at all?

22       A    I understand that -- and this is

23   conversationally, that he -- he'll fire somebody

24   if they have excessive old beer.  But I saw no

25   documentation of that in -- in anything that I

BILL GIALKETSIS - 04/13/2017

Page 57

```
 1        Q     And what types of accounts would you
 2   visit?
 3        A     Well, for example, I -- I was part of a
 4   presentation recently where we presented a
 5   sponsorship deal to Stations Casino, and that was
 6   with the -- a guy named -- the -- basically the
 7   entire executive team from Stations corporate.  So
 8   the guy who is in charge of hospitality, the guy
 9   who is in charge of purchasing, the chief
10   financial officer for the corporation, that kind
11   of a presentation.  A boardroom presentation.
12        Q     How important in your business is it to
13   have a positive relationship with your retail
14   accounts?
15        A     It's everything.
16        Q     Why is that?
17        A     Because they -- they decide whether
18   you -- whether you live or die, to put it a little
19   dramatically.
20        Q     Are your beer brands -- the brands you
21   carry are also important I guess to some degree;
22   correct?
23        A     Important to me?
24        Q     Important to the market.
25        A     I hope so.
```

BILL GIALKETSIS - 04/13/2017

Page 60

```
 1        A    I think it was for four or five days, if
 2   I recall.  It was a few years ago.  But, yeah,
 3   I've had -- believe me, yeah, I've had stuff like
 4   that.
 5        Q    Have you had to terminate any employees
 6   who kind of crossed the line with retail accounts
 7   or anything like that?
 8        A    Yeah.  For example, recently, which --
 9   end of last year, I had a merchandiser -- you
10   know, Nevada Beverage, their merchandisers -- I
11   don't know if was a merchandiser or sales --
12   anyway, he left his -- his iPad sitting on a stack
13   of beer.  Now, I don't know if he left the
14   account.  I think he did.  I think he left it.
15             One of the -- one of my merchandisers
16   stole the -- stole the iPad.  I don't know if he
17   thought he was being clever or what he thought he
18   was doing.  But they caught him on camera doing
19   it, so, yeah, I canned him.
20        Q    Would you ever tolerate any of your
21   merchandisers or people using profanity towards
22   anyone in the market?
23        A    I -- you know, it's -- that's a tough
24   question.  I mean, strictly speaking, no.  But
25   do -- the problem is that everybody uses profanity
```

BILL GIALKETSIS - 04/13/2017

1  these days, including your customers.  And, you

2  know, I've seen -- I've been in a situation where

3  a salesman or a -- or a customer uses -- you know,

4  uses what might be considered crud language, and

5  it's just part of the dialogue.

6           So not strictly speaking, but if --

7  pardon me.  If a salesman or somebody used

8  language and -- you know, to -- to insult

9  somebody, that would not be acceptable.

10      **Q    What would the consequences be?**

11      A    Well, it would depend on the

12  circumstances and then, you know, how -- how

13  verifiable and, you know, who was there and -- but

14  it could be pretty severe.  But it -- yeah, it --

15      **Q    What about to your suppliers, would you**

16  **let any of your people curse, use profanity in**

17  **anger or agitation or frustration, as opposed to**

18  **casually to any of your suppliers?**

19      A    Well, in any business relationship,

20  there's always frustrations.  There's -- sometimes

21  there's frank conversations.  There's -- you know,

22  sometimes there's anger, and it has to be managed.

23           I don't know that there's any super

24  strict rules about what's -- what's inbounds and

25  what's not, beyond any -- beyond physical

BILL GIALKETSIS - 04/13/2017

Page 62

```
 1   violence.
 2        Q     And in terms -- do you guys have a
 3   policy against the usage of profanity?
 4        A     I don't believe that we do.
 5        Q     If one of your managers, for example,
 6   called one of your retailers a lying effing B,
 7   what would the consequences of that be?
 8        A     If I knew it happened and I knew that
 9   was true?
10        Q     Yes.
11        A     You know, I would have to weigh the
12   circumstances and weigh the -- weigh what happened
13   and -- and I might just leave it to his supervisor
14   to decide.  But I think at least it would merit
15   some kind of letter in their file or maybe a
16   suspension and maybe a firing.
17        Q     You don't think that's good for the
18   Bonanza brand and the market to have people using
19   profanity towards retailers?  You would agree with
20   that?
21        A     In the -- in the way you say it?
22        Q     Yes.
23        A     You know, cursing somebody out?
24        Q     Yes.
25        A     No, I don't.
```

BILL GIALKETSIS - 04/13/2017

Page 64

1    important.

2        Q    Have -- has Bonanza ever terminated --

3    let me -- let me take a step back.

4            Have you ever in your career at Bonanza

5    or in the market generally heard of an instance

6    where someone in a management position at a

7    distributorship cursed out a retailer?

8        A    You know, I -- I would be hesitant to

9    say that I have never heard of something like that

10   happening, but I certainly can't recount a time.

11       Q    All right.  That's a pretty extreme

12   event.  You would agree?

13       A    Yeah, I guess I would.

14       Q    All right.  Now, in terms of your

15   opinions in your expert report, there were --

16   there were certain credibility judgments that you

17   made in terms of whether you thought someone was

18   telling the truth or not.

19           Do you recall making those in your

20   report?

21           MR. REID:  The question is overbroad

22   and vague.

23           THE WITNESS:  If you want to tell me

24   what you're talking about, I'll answer the

25   question.

Page 68

```
 1       A    Yes.

 2       Q    Okay.

 3       A    Yes.

 4       Q    Turning back to your expert report,

 5  which is Exhibit 2 --

 6       A    But I want to repeat what I said, which

 7  is my overall recollection is that there's not

 8  much substantiation of these claims of Paul -- I

 9  believe one claim was that he stood out on the

10  dock or something and yelled at drivers coming

11  back, "I'm going to burn your ass" or something

12  like that.  I saw nothing to substantiate that.

13       Q    If that did happen, if he did make a

14  comment of the nature that you just described,

15  would you think that was unprofessional?

16       A    I would.

17       Q    Do you, in your contracts with your

18  distributors, take, for example --

19       A    My suppliers?

20       Q    Suppliers.  Excuse me.  Yes.  You don't

21  have distributors.

22            Would your suppliers have provisions in

23  there that protect the brand, so to speak, that

24  they -- for example, say that the distributor

25  can't do anything to disparage or embarrass the
```

BILL GIALKETSIS - 04/13/2017

Page 69

1   brand in the market?

2       A     I believe the -- some of the -- I

3   believe that the contracts mostly all say that,

4   yeah, something to that effect.

5       Q     So that's an industry standard term, to

6   your understanding?

7               MR. REID:  Calls -- calls for a legal

8   conclusion.

9               THE WITNESS:  All I can say is I've

10  seen that language in most of the contracts that

11  I've dealt with, some language to that effect,

12  yes.

13  BY MR. WELSH:

14      Q     Do you think that's a fair and

15  reasonable term?

16              MR. REID:  Same objection.  Calls for

17  a legal conclusion.

18              THE WITNESS:  To my mind, it is.  It

19  is reasonable.

20  BY MR. WELSH:

21      Q     All right.  And from the supplier's

22  perspective, why do you think that's an important

23  term?

24      A     Because when you're selling their brand,

25  you -- you're representing them.  To a customer

BILL GIALKETSIS - 04/13/2017

Page 70

1   that's buying their product, you're the -- you can

2   be the face of that brand.  And it's important

3   that -- that you guys are -- that you're on the

4   same team, that you support each other, which is

5   why that -- you know, I mean, there's things that

6   I -- I have -- you know, I -- we talked about the

7   reputation of Sierra, and it's a good reputation.

8           But I've got to tell you, there's things

9   that I -- in these depositions that really make me

10  wonder about what kind of -- what kind of things

11  were they doing up there.  Because, I mean,

12  there's e-mails that talk about -- that -- they

13  share with other beer suppliers talking about, you

14  know, private conversations they had with Paul,

15  stuff that seems to me highly inappropriate, and

16  just things that bother me.

17      **Q     All right.  I was just asking about the**

18  **importance of -- of those terms that are in**

19  **your --**

20      A     Well, what I'm saying is they expect it

21  from me and I expect it from them --

22      **Q     All right.**

23      A     -- is what I'm saying.  I don't expect

24  them to -- to go behind my back to a customer and

25  say, "Oh, that crummy Bonanza Beverage, if only

BILL GIALKETSIS - 04/13/2017

1    Packaging that's not torn or ripped or falling

2    apart.  Fresh beer.  Rotated beer.  That's my

3    understanding of quality assurance.  But brand

4    standards can obviously overlap that.

5         **Q    Do you use any other nomenclature to**

6    **refer to "brand standards"?  Is there another --**

7         A    I use the nomenclature that my suppliers

8    use, and they have an endless number of terms and

9    things.

10        **Q    All of which would fall either under**

11   **brand standards or quality assurance standards**

12   **type --**

13        A    Or something else.  I mean, they have

14   terms for everything.

15        **Q    All right.  Let's just focus on brand**

16   **standards now.**

17        A    Okay.

18        **Q    Are they common in the beer industry?**

19        A    For craft brewers, they are especially.

20   But even for -- for other -- other beer guys now.

21   It's becoming more -- more and more commonplace

22   with, say -- let's say a Mike's Hard Lemonade or

23   Smirnoff Ice, they have a lineup of brands that

24   they want to see on a shelf, say.

25             But Smirnoff brand standards obviously

Page 102

1  don't have anything to do with, say, draft or

2  something like that, because there is no draft.

3      **Q    How many beers does Bonanza distribute?**

4      A    Oh, I don't know.

5      **Q    Ballpark?**

6      A    By SKU or brewer?

7      **Q    A brewer.  Let's go brewer.**

8      A    Oh, I don't know.  20, 25, something

9  like that.

10     **Q    How many of them have brand standards?**

11     A    All of the big ones do, I would say.

12     **Q    Boston Beer has brand standards;**

13 **correct?**

14     A    Very much so, yes.

15     **Q    Deschutes?**

16     A    Yes, but they're -- they're -- yeah,

17 they do.

18     **Q    We'll walk through them.**

19     A    We won't -- you know, if you want to

20 talk about who enforces them and who doesn't or

21 who -- you know, that's a different question.

22     **Q    Miller have brand standards?**

23     A    Very much so.

24     **Q    Can you give me some examples of brand**

25 **standards?**

BILL GIALKETSIS - 04/13/2017

Page 103

1        A      Well, I think we already talked a little

2    bit -- for example, on a Miller quality control

3    audit, what -- how much old beer you can have.  If

4    the beer is over 30 days old, then -- then the --

5    that gets marked in a different way than a beer

6    that might be two days out of code, say.  There's

7    just -- I mean, there's a book of rules and

8    regulations that's that thick for MillerCoors, and

9    that's -- their quality standards are the

10   standards that basically we follow as a company at

11   Bonanza Beverage.

12        **Q      Got it.**

13            **Do your brands, as part of their brand**

14   **standards, try to encourage Bonanza to give what**

15   **would be considered premium shelf space at retail?**

16        A      Very much so, yes.

17        **Q      Why is that?**

18        A      Well, because that -- because brand --

19   in a shelf setting, in an off-premise setting,

20   where the brand is on the shelf is very important

21   to the sales -- pardon me -- the sales of the

22   brand.  It can be very -- be influential.

23        **Q      What is the best spot to have --**

24        A      Well, you can -- you can get some

25   disagreement.  But in my opinion, it's eye level.

BILL GIALKETSIS - 04/13/2017

Page 110

```
 1        A    Yes.

 2        Q    How is it tracked?

 3        A    It's tracked -- the -- it's tracked

 4    different ways in different segments of the

 5    market.  For example, a team goes in -- let's say

 6    a team goes into the Westgate over here.  They go

 7    to -- you know, usually it's a prearranged event.

 8    Right?  You have to make an appointment with --

 9    they don't like people just coming in and going

10    behind their bars and stuff, especially at a

11    hotel.

12            So they go in.  They hit all of the

13    bars.  They -- they dig through the wells.  They

14    look for all -- you know, the places where they

15    store the beer, the places where beer might be

16    where they don't necessarily always tell you that

17    it is.  They go to banquets.  They go to catering.

18    They go to the bars.  They go to the pools.  They

19    go to the -- and then they --

20            If there's old beer, they pull it and

21    tag it.  Sometimes they destroy it on the spot.

22    And then a report is generated to the -- to the

23    guy who runs the merchandising department.  And

24    then he sends an e-mail recapping the -- recapping

25    the -- the rotation effort.
```

BILL GIALKETSIS - 04/13/2017

Page 111

1                Now, for a -- for an audit of a -- of a

2   route, of a sales route, like I told you before, a

3   person starts at -- they go through every account

4   on the route.  They go through it.  They go to

5   every account.  They look through the account.

6   Let's say it's a bar route.  They -- they go in.

7   They -- they look behind the bar.  They look in

8   the back room.  They -- they dig out the wells.

9   Any old beer that they find, they tag.

10              And then, again, a report is generated,

11   but it's -- there's a report every day, but let's

12   say it takes two weeks to go through the guy's

13   route.  When the -- when the full audit is

14   completed, then a -- then a report is generated on

15   how the guy did based -- and it's got the location

16   where the beer was found, the page that was found,

17   the date.  Sometimes if they see something that's

18   going to go out of code, they note that.  There's

19   a place for notes.

20              Then the -- then the -- that report is

21   given to a gal in the office, and if it's -- if

22   it's a fail, right -- they give it to the gal in

23   the office.  She tabulates the value of it,

24   divides it by 70/30.  And then that goes to the

25   human resources guy, and he prepares paperwork

BILL GIALKETSIS - 04/13/2017

1   that they have to sign, because we dock their pay.

**2       Q      How often are the routes audited?**

3       A      They're audited constantly.

**4       Q      Why is the -- why is that?**

5       A      Well, because you have to stay on top of

6   rotation all the time.

**7       Q      Do any of your suppliers require you to**

**8   keep inventory minimums?**

9       A      They suggest it.  They do not

10  necessarily require it.

**11      Q      And which ones are those?**

12      A      All of them.

**13      Q      All of them.**

**14              What's the most inventory a supplier**

**15  makes you -- or --**

16      A      The most -- the guys that seem to want

17  the most -- and I think this has more to do with

18  their year-end financial reports -- is Diageo.

19  They do what they call a -- an order drill.  It's

20  usually -- I think their fiscal ends at the end of

21  June.

22              So always at the end of their fiscal

23  year, they're always coming around asking for

24  additional orders.  And, you know, usually pretty

25  insistent about it to -- because I think it looks

BILL GIALKETSIS - 04/13/2017

Page 123

1   at the distributor council meetings.

2       **Q      Do you -- do you know if Miller has ever**

3   **terminated a distributorship because it failed to**

4   **meet brand standards or quality assurance**

5   **standards?**

6       A     You're confusing two things there.

7   Quality assurance, I believe I've -- I don't know

8   if they have ever terminated anybody, but I know

9   they've come close.

10      **Q      Who -- which distributorship?**

11      A     Oh, you know, I don't -- I'm not -- I

12  don't want to -- it's long times ago.

13      **Q      All right.  And here in Reno -- I mean,**

14  **in Nevada?  Excuse me.  Nevada?**

15      A     Not in Nevada.  Other places.

16      **Q      Other places?**

17      A     But that's -- that's -- that's what you

18  can get terminated for, is quality assurance.

19  I've never heard of anybody getting terminated for

20  brand standards.

21      **Q      Have you ever heard of anybody who fails**

22  **to meet brand standards over and over without**

23  **showing any signs of improvement?**

24      A     I -- hopefully not me.  But like I say,

25  it is -- it is a constant process.  And, you know,

Page 143

1   clean glassware was a brand standard?

2        A    I thought I saw it in one of the -- one

3   of the listings of what they look at.

4        Q    And you're not confusing this with the

5   draft lines and --

6        A    No, I don't think so.

7        Q    All right.  Clean draft lines would be

8   a --

9        A    Absolutely.

10       Q    -- brand standard; correct?

11       A    Well, that's not a brand standard.

12  That's a quality standard.

13       Q    You're right.  Quality standard.

14            How often does your company try to clean

15  the --

16       A    Every two weeks.

17       Q    Two weeks.

18            Is that industry standard?

19       A    I would say so.

20       Q    Do you track that?

21       A    Absolutely.

22       Q    How?

23       A    We get a report.  All of the lines in

24  this town are cleaned by a company called Clark

25  County Beverage Management, and they provide a

Page 150

1    about it, but I've heard it.

2       Q    All right.  Which consulting groups do

3    you recall?

4       A    No, I don't.

5       Q    Do you -- were these Nevada -- or

6    Nevada, excuse me, distributors?

7       A    Could have been.  But I think it would

8    be more on a national context.

9       Q    What are Sierra Nevada's quality

10   assurances standards?

11      A    To keep the beer fresh and that you

12   rotate it and that you take care of the products.

13   The same with -- with anybody.

14      Q    All right.  So then there's nothing

15   about the Sierra Nevada quality assurance

16   standards that are unique?

17      A    Well, the question I would have about

18   the Sierra standards is I don't know what the

19   standards are.  And when I review the documents, I

20   don't -- I don't understand what -- what is the --

21   on an audit, say, or on a -- I guess a Fresh

22   Friday program, what is -- what is a passing --

23   what is a passing grade?  What is a failing grade?

24   You know, what is -- you know, I don't -- I don't

25   get that sense reading through the documentation.

Page 222

1  BY MR. WELSH:

2      **Q    As a matter of industry practice, you**

3  **would not bill back for a discount -- "you,"**

4  **meaning a distributor, would not bill back for a**

5  **discount -- go back to the supplier for a discount**

6  **that wasn't passed on to the retailer; correct?**

7      A    I would not.

8      **Q    Now --**

9      A    Again, you know, I just -- I just want

10 to point out that we're dealing with an issue

11 that -- an issue that came up in the bill of

12 particulars against Crown, but that in my mind was

13 settled three years ago.  I mean, Crown paid what

14 they owed, and everybody went on with their lives.

15 I mean, the issue was settled.

16     **Q    Mr. --**

17     A    And the -- in any business, when you --

18 when you have a problem or you have a

19 misunderstanding about what went on, you settle

20 the problem, Crown made good, and you -- you go

21 on, which is exactly what they did.

22     **Q    And that -- did you -- are you aware of**

23 **the existence of any documents from that 2013 time**

24 **period where it was clear that Mr. Whitney and**

25 **Mr. Foster from Sierra Nevada, both in management**

BILL GIALKETSIS - 04/13/2017

Page 259

1   promote its craft brands?

2       A    No, I don't.

3       Q    How much does Bonanza spend on average?

4       A    It varies.  Usually what we set aside is

5   50 cents a case on -- on most of our craft

6   brands -- I'm trying to think -- even the smaller

7   ones.  Some of the smaller ones we might spend

8   more.

9            It's a little bit of a different

10  calculation with Boston Beer, because Boston Beer

11  takes a -- marketing money automatically at 45

12  cents a case, which we don't really see at all.  I

13  mean, we see it on advertising and stuff like

14  that.  But -- so them, I think it's more like a --

15  like a dime or something.

16      Q    Do you know what industry standards are

17  for craft brands?

18      A    I don't know that there is one.

19      Q    Do you know how much money Crown spends

20  on a per-case basis on its craft brands --

21  marketing its craft brands?

22      A    No, I already said I don't.

23      Q    Okay.  Do you know how much Jaye and

24  Paul Bond pay each other per year?

25      A    No.

Page 282

```
 1                    MR. WELSH:  All right.  He's about to
 2    run out of time on his video, so we need to take a
 3    break so he can change the disk.
 4                    THE WITNESS:  Okay.
 5                    MR. WELSH:  So we'll be back in five
 6    minutes or so.
 7                    THE VIDEOGRAPHER:  Off the video
 8    record at 2:56.
 9                    (Whereupon, a recess was taken.)
10                    THE VIDEOGRAPHER:  This is the
11    beginning of Media No. 4.  Back on the video
12    record at 3:07.
13    BY MR. WELSH:
14         Q    Do you think it's ever appropriate --
15    I'm sorry.  I'll let you finish your water before
16    I --
17         A    Go ahead.
18         Q    -- for a person at the warehouse or a
19    manager at the warehouse to call anyone in the
20    trade while they're intoxicated?
21         A    No.
22         Q    Do you guy have a policy about having
23    weapons on premises at Bonanza?
24         A    Not a strictly written policy.  I mean,
25    for example, my dad for many years kept his
```

BILL GIALKETSIS - 04/13/2017

Page 283

1    hunting rifles leaning in the corner of his

2    office.  But in terms of employees, you know,

3    bringing guns to work or something like that, I

4    mean, we've never really had that problem.

5             One time a guy came in with a machete

6    and -- and basically we fired him over it, a

7    driver.  And so we don't have a written policy

8    that I -- I don't believe, but -- but it -- I

9    would say that we do not let people bring their

10   weapons to -- to work if we know about it.

11        **Q    Let's say in the last five years, you**

12   **guys have guns on premises?**

13        A    Not that I know of, nope.

14        **Q    All right.  Do you understand how the**

15   **presence of guns, that might intimidate some**

16   **people?**

17        A    Yeah, sure.  I -- if they were visible,

18   I guess, sure.

19        **Q    Because guns are kind of dangerous.**

20        A    Yeah.

21        **Q    Have you -- were you taught to always**

22   **assume a gun is a loaded gun?**

23        A    I was.

24        **Q    All right.  Do you think that's wise**

25   **advice?**

Page 284

```
 1      A    Yes.

 2      Q    All right.  So are you familiar with the

 3  letter that Mr. Whitney wrote to Mr. Bond about

 4  the presence of guns on Crown's premises in the

 5  September 2014 time period?

 6      A    Is that the one that refers to the

 7  judge?

 8      Q    It doesn't mention any weapon by name.

 9  It just talks about a dispute between the parties

10  about interpersonal issues and performance issues.

11      A    I'm not sure that I do.  I remember I

12  think a letter from Joe -- I thought it was from

13  Joe Whitney that said something about -- talking

14  about a gun that Paul -- that he ominously refers

15  to as the judge.  That's -- that's the phrase

16  that -- that really struck me.

17           MR. REID:  That's his phrase, but --

18           THE WITNESS:  Oh, that -- that was

19  your letter?

20  BY MR. WELSH:

21      Q    That's the 2016 letter; correct?

22      A    I think it is.

23      Q    Do you recall reading a letter from

24  Mr. Whitney in the 2014 time period?

25      A    You know, I might have read it, but I
```

BILL GIALKETSIS - 04/13/2017

Page 261

```
 1        A    Whenever you're working.  I mean, you
 2   can be working past 9:00 to 5:00 and, like, say,
 3   be at a -- let's say we're doing a beer dinner or
 4   let's say we're doing a -- kicking off Stone
 5   Domination at a craft bar.  Yeah, we're buying
 6   beers.  We expect people to have a couple of
 7   beers.
 8             But we also make it very clear that --
 9   you know, we -- we employ, like, this ride service
10   that drives you and your car home.  If you need to
11   take it, take it.  If you need a ride, take it.
12   But, yeah, we -- we frown on drinking during the
13   day.
14        Q    Why is that?
15        A    Well, because it -- it cuts down on
16   people's productivity and ability to do work.
17        Q    Do you agree with me that people are
18   more apt to make mistakes when they're drinking?
19        A    I think that could be possible.
20        Q    Do you think that people are more apt to
21   be aggressive when they're drinking?
22        A    Some people are.
23        Q    Did you ask Mr. Bond about his drinking
24   at all?
25        A    I did not.
```

Page 314

```
 1   out-of-code, out-of-stock, out-of-rotation --

 2       A    Now, that's their quality standards,

 3   we're talking.

 4       Q    Those are quality standards.

 5            Those are all clear; correct?

 6       A    In my mind, yeah.

 7       Q    And in terms of the brand standards,

 8   wanting to have as many six-packs and front

 9   facing, you know, bottles as your leading

10   competitors, wanting to eye level and all of that,

11   those are relatively clear as well; correct?

12       A    To the extent that I'm -- I know them,

13   yeah.

14       Q    All right.  Now, in terms of the

15   statement that there's no way to verify the

16   accuracy of what Mr. Rosario did --

17            MR. REID:  Where are you -- where are

18   referring?

19            MR. WELSH:  I'm just -- well, I

20   just -- he just -- he read the part about no way

21   to verify the accuracy.

22            MR. REID:  Okay.

23            THE WITNESS:  Right.

24   BY MR. WELSH:

25       Q    Okay.  You just read it.
```

BILL GIALKETSIS - 04/13/2017

Page 317

1  based on what he said.

2      Q    I would like you to assume that they

3  only visit 40 accounts a month, as opposed to 45

4  per week.

5           Do you think that would be insufficient?

6      A    45 a month?

7      Q    Yeah.  40 a month.

8      A    And that's the only -- only quality

9  control that you're doing or --

10     Q    Yes, by Crown.

11          MR. REID:  Well, that -- that's an

12  improper hypothetical.  It assumes facts that are

13  false.  But with that understanding ...

14          THE WITNESS:  To me, that would sound

15  light.

16  BY MR. WELSH:

17     Q    Light.  Okay.

18          Do you know whether or not Mr. Bond

19  refused the Better Beer Business Account Survey

20  reports?

21     A    Again, it's just my impression, based on

22  talking to him about this stuff and I think

23  something in his deposition, my -- I have an

24  impression that he maybe reviewed some of them.

25  I'm not sure that -- that he would necessarily be

BILL GIALKETSIS - 04/13/2017

```
 1        Q     All right.  Do they have Raley's in
 2   Arizona?
 3        A     You got me.
 4        Q     I don't think they do, but I don't know,
 5   so not willing to bet $1,000 on that.
 6              I want to talk a little bit about the
 7   Bonanza Beverage website and social media
 8   presence.
 9        A     Okay.
10        Q     You guys got a Twitter account?
11        A     I think we do, yeah.
12        Q     It's pretty nice; right?  You guys
13   promote a bunch of beers on that?
14        A     Yeah, we do.  I mean, we've struggled
15   with it.  I don't know if it's as good as it could
16   be.  I don't know.
17              What did you think of it?
18        Q     I thought it was cool.
19        A     Did you?
20        Q     Yeah.
21        A     Good.  I'm glad to hear -- I'm glad to
22   hear that.
23        Q     What about --
24        A     Believe me, we struggled with it.
25        Q     What about your Facebook account?
```

BILL GIALKETSIS - 04/13/2017

Page 330

```
 1        A    Again, you know, it's something I think
 2   we struggled with a little bit.  I mean, you know,
 3   our marketing guy is supposed to keep it up and
 4   keep it -- and our craft guy, you know, he's
 5   supposed to be involved with it.  But I have to
 6   tell you, I don't follow it.  And sometimes I
 7   worry about what -- you know, what's on it or if
 8   it's updated or they're keeping it current.
 9        Q    Do you understand, within the -- within
10   the craft business or the craft space, that having
11   a social media presence is a little bit more
12   important?
13        A    I do.
14        Q    Who told you that?
15        A    I gleaned it.  The same way I gleaned
16   about what "good cause" means.
17        Q    Got it.
18        A    From my experience.
19        Q    And you have a website, as well, a
20   Bonanza Beverage website?
21        A    Correct.
22        Q    And on that website, you -- you promote
23   a -- all of your craft brands and your premium
24   brands?
25        A    We try to, yeah.
```

BILL GIALKETSIS - 04/13/2017

Page 355

1   Mr. Bond was in a leadership role at Crown, made

2   the decision to contract with Sierra Nevada.

3           Are you aware of that?

4   A    I am aware of that.

5   Q    Okay.

6   A    But did -- are you saying that when he

7   took on Lagunitas and he took on Deschutes and he

8   took on these other brands, are you saying that he

9   wasn't involved in that?  How can you say that?

10  Q    I'm not supposed to answer those

11  questions because of the process in place.  I'll

12  move on.

13  A    Okay.  Well, all right.  Then forget it.

14  Q    What -- what is Jaye Bonds' -- what are

15  her duties at Crown?

16  A    I don't know.

17  Q    All right.  Did you give a -- did you

18  review any of Mrs. Bonds' testimony?

19  A    I don't believe I did.

20  Q    Do you know whether or not Mr. Bonds is

21  considering retiring?

22  A    No, I don't.

23  Q    Have you heard in the market one way or

24  the other whether --

25  A    Nope, I haven't heard anything about it.

1                    CERTIFICATE OF COURT REPORTER

2

STATE OF NEVADA       )
3                     )   ss:
COUNTY OF CLARK       )
4

5        I, Heidi K. Konsten, Certified Court Reporter

6    licensed by the State of Nevada, do hereby certify

7    that I reported the deposition of BILL GIALKETSIS,

8    commencing on April 13, 2017, at 9:03 a.m.

9         Prior to being deposed, the witness was duly

10   sworn by me to testify to the truth.  I thereafter

11   transcribed my said stenographic notes via

12   computer-aided transcription into written form,

13   and that the transcript is a complete, true and

14   accurate transcription and that a request was made

15   for a review of the transcript.

16       I further certify that I am not a relative,

17   employee or independent contractor of counsel or

18   any party involved in the proceeding, nor a person

19   financially interested in the proceeding, nor do I

20   have any other relationship that may reasonably

21   cause my impartiality to be questioned.

22       IN WITNESS WHEREOF, I have set my hand in my

23   office in the County of Clark, State of Nevada,

24   this April 18, 2017.

25                     _____
                       Heidi K. Konsten, RPR, CCR No. 845